Gary PLOOF, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 108, 2012.

Supreme Court of Delaware.

Submitted: March 6, 2013.
Decided: June 4, 2013.
Corrected: Aug. 15, 2013.

Patrick J. Collins (argued), Collins & Roop, Wilmington, Delaware; Kathryn J. Garrison, Schmittinger & Rodriguez, P.A., Dover, Delaware, for appellant.

John Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, Justices and STRINE, Chancellor * constituting the Court en Banc.

STEELE, Chief Justice for the Majority:

In this appeal of a denial of a postconviction relief motion, we examine whether defense counsel were ineffective during a defendant's first-degree murder trial. We hold that the attorneys' alleged failure to consult with a forensic pathologist or toxicologist, to present more evidence regarding the victim's dominant hand, to investigate ballistics issues, appeal certain issues, and to object to the dismissal of jurors who indicated that they could not impose the death penalty did not prejudice the defendant during his trial's guilt phase. During the penalty phase, however, the postconviction hearing judge failed to reweigh the aggravating evidence against the total mix of mitigating evidence in determining whether the attorneys' failure to present additional evidence during the penalty phase prejudiced the defendant. Accordingly, we **AFFIRM** in part and **REMAND** in part so that the postconviction judge can supplement his opinion for further review.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

### A. Heidi Ploof's Death

This case arises from the 2001 death of Heidi Ploof (Heidi). Heidi and her husband, Defendant–Appellant Gary Ploof (Ploof), lived in Hartly, Delaware. Ploof primarily worked as an aircraft mechanic

---

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

1. The facts are taken from the record, the trial judge's opinion after Ploof's penalty hearing, *State v. Ploof* (*Ploof I*), 2003 WL 21999031 (Del.Super. Aug. 22, 2003), our opinion in Ploof's direct appeal, *Ploof v. State* (*Ploof II*), 856 A.2d 539 (Del.2004), and the Superior Court's postconviction opinion, *State v. Ploof* (*Ploof III*), 2012 WL 1413483 (Del.Super. Jan. 30, 2012).

at Dover Air Force Base, while Heidi worked at a grocery store in Maryland. By late 2001, Ploof had begun an extramarital affair with Adrienne Hendricks, a coworker at his part-time job.

On November 1, 2001, the United States Air Force began providing employees with $100,000 in life insurance coverage for their spouses. The policies automatically became effective unless an employee opted out. After Ploof's supervisor informed him of the program, Ploof told her he planned to opt out, but he took no action to do so.

Sometime during the evening of November 3, 2001, Heidi left her job early after having an argument with her supervisor. She never returned home. Later that evening, Ploof reported that Heidi was missing.

On the morning of November 4, Ploof called Hendricks and his friend Richard Jackson to tell them that Heidi was still missing. Hendricks, Jackson, and Jackson's wife went to Ploof's home to assist him. Some time after Jackson arrived, Ploof gave Jackson his .45–caliber automatic pistol and its case and asked Jackson to keep them for a while.

That same morning, a passerby discovered Heidi's body in the driver's seat of a car in the parking lot of a Dover discount store. Heidi had been shot in the left ear and the bullet had passed through her right cheek. The police found a .357–caliber bullet in the car, along with a bullet jacket. The store's security camera recorded Heidi's car entering the parking lot on the evening of November 3. The video footage showed a car driving into the lot, a man standing beside the driver's side of the car after it was parked, and that same man walking away from the car toward the highway.

When the police informed Ploof of Heidi's death later that day, they noted that while he appeared to be crying, he did not shed any tears. The officers interviewed Ploof but allowed him to return home later that evening. The investigating officer also noted that Ploof ceased crying after he informed Ploof of the store's security footage.

On the evening of November 5, the police asked Ploof to return to the station for another interview. Before leaving for the interview, Ploof gave Jackson an empty gun case, which Jackson put in his vehicle. While the police were interviewing Ploof, another team of officers executed a search warrant on Ploof's property. When the police searched the premises, they found a concealed .357 Ruger Security Six Revolver and .357 shell casings. Ploof had denied owning any guns. The police later matched the bullet jacket in the car to the Ruger. Once the police discovered the gun, they arrested Ploof for Heidi's murder. After learning of Ploof's arrest, Jackson called the police and turned over the .45–caliber pistol and gun cases he had been keeping for Ploof. A grand jury later indicted Ploof on the charges of Murder in the First Degree [2] and Possession of a Firearm During the Commission of a Felony.[3]

While Ploof was incarcerated, investigators obtained two letters purporting to be from Heidi's killer. These letters stated that they were written by a man who had been having an affair with Heidi, described details of Heidi's death, and stated that Ploof was innocent. Officers found Ploof's fingerprints on the letters.

### B. Ploof's Guilt–Phase Trial

Ploof's guilt-phase trial lasted nine days. The State presented testimony from police

2. 11 *Del. C.* § 636.

3. *Id.* § 1447A.

officers, experts, an eyewitness, and Heidi's and Ploof's friends and coworkers.

Deborah Jefferson, who worked at the discount store, testified for the State. Jefferson testified that while taking a break in front of the store on the evening of November 3, she saw a woman driving a car into the parking lot with a man in the passenger seat. According to Jefferson, the woman drove the car to the side of the store, and the man walked back to the front of the store toward the highway roughly ten minutes later. Jefferson recognized Ploof's clothing, and her description matched the image on the security camera's footage.

Dr. Judith Tobin, a state medical examiner, served as an expert witness for the State.[4] She had performed Heidi's autopsy and described for the jury how Heidi had died. Tobin described the bullet's probable trajectory and opined that the markings on Heidi's body indicated that the bullet had been fired six to seven inches away from Heidi's left side. Because family members had told Tobin that Heidi was right-handed, Tobin opined that it would be extremely difficult for a right-handed person to shoot herself from her left side. She testified that women seldom kill themselves with firearms and that she thought Heidi had been murdered.

Hendricks testified that she had been having an affair with Ploof before Heidi's death. She stated that Ploof had told her that Heidi planned to move out of Ploof's home and that she should move in on November 5. Hendricks saw no boxes or other signs that Heidi planned to leave when she visited Ploof on November 4, however. Although Ploof appeared to cry intermittently throughout that day, Hendricks also never saw any tears.

Several witnesses testified that Ploof owned a Ruger and had recently told them that his money problems would soon be over. Ploof's supervisor testified that she had told Ploof about the Air Force's plan to offer life insurance for spouses. Jackson testified that his wife became upset after hearing Ploof make a phone call shortly after Heidi's death to see if he could collect Heidi's life insurance.

Ploof's counsel during his trial (Trial Counsel)[5] presented evidence she argued showed that Heidi had committed suicide. Ploof testified that Heidi was upset because a court had terminated her parental rights over a daughter from a previous relationship, and because the adoptive parent had recently warned her not to contact the child. Trial Counsel also presented testimony that Heidi had previously used drugs and was listed on Delaware's Adult Abuse Registry[6] because she had struck a resident at a nursing home. She had lost her job at the nursing home because of the incident. Also, Heidi had been rebuffed by a deliveryman after kissing him once and hugging him several times.

Ploof stated that Heidi was unhappy with her job at the grocery store. On the night of her death, she was upset after arguing with her supervisor and wanted Ploof to meet her in Dover. Heidi met Ploof at a location near the Dover discount store where a passerby later found her body. According to Ploof, Heidi began crying about all her problems, especially the termination of her parental rights. After Heidi refused to come home, Ploof began walking away from the car and

---

4. This opinion discusses Tobin's testimony in greater detail in Part III.C.1 *infra*. .·

5. Several attorneys represented Ploof during his trial and direct appeal. For simplicity

and clarity, we refer to Ploof's attorneys collectively, using the singular "she."

6. *See* 11 *Del. C.* § 8564 (describing the Adult Abuse Registry).

heard Heidi shoot herself. He stated that Heidi was ambidextrous and shot herself with her left hand. Upon seeing his wife commit suicide, Ploof decided to move Heidi's body to the discount store's parking lot so that the police would find her quickly. He claimed he did not report the suicide because he did not want people to know about the termination of Heidi's parental rights and her other problems. Ploof hoped that the police would treat Heidi's death as an unsolved murder. To accomplish this plan, he took the Ruger, ammunition, and gun case and put them in his truck. Then he got into the driver's seat of Heidi's car—with her body still in the same seat—and drove the car to the nearby discount store. He denied owning the Ruger. Ploof claimed he took it because he knew a gun dealer and hoped that he and the gun dealer could trace the gun's origin to find out how Heidi acquired it.

Ploof testified that he wrote the letters purporting to be from Heidi's real killer because his cellmate had told him that the police would have to release him if he did so. He denied that he had serious money problems and denied ever owning a Ruger, though he admitted owning the .45–caliber pistol.

The State presented rebuttal witnesses after the defense rested. Notably, Heidi's left-handed brother testified that Heidi was right-handed and that he remembered because he had to adjust his fishing pole so that Heidi could use it.

After deliberating for two hours, the jury found Ploof guilty of Murder in the First Degree.[7]

## C. Ploof's Penalty–Phase Trial and Direct Appeal [8]

Because the jury found Ploof guilty of Murder in the First Degree, the trial judge conducted the penalty hearing 11 Del. C. § 4209 requires.[9] The State relied on two statutory aggravating factors in seeking the death penalty: (1) murder for pecuniary gain and (2) murder that was premeditated and the result of substantial planning.[10] Defense Trial Counsel relied on twelve mitigating circumstances, including Ploof's background and his history of gainful employment. Trial Counsel also argued that Ploof had a distinguished military career and was unlikely to commit any future violent crimes. The State pre-

---

7. The jury also found Ploof guilty of Possession of a Firearm During the Commission of a Felony.

8. For the reasons stated in Part III.F *infra,* we do not discuss Ploof's penalty phase claims in this opinion. We will describe the penalty phase in greater detail after the Superior Court judge supplements his analysis.

9. Under Delaware law, any person convicted of Murder in the First Degree shall be punished by death or life imprisonment. 11 Del. C. § 4209(a). The *jury* must unanimously find that the State has proven at least one statutory aggravating circumstance beyond a reasonable doubt before the court can impose the death penalty. *Id.* § 4209(d)(1). The jury must also tell the trial judge whether it believes that the aggravating circumstances outweigh the mitigating circumstances and the number of jurors who vote each way. *Id.* § 4209(c)(3). To impose the death penalty, the *judge* must find that the aggravating circumstances outweigh the mitigating circumstances by a preponderance of the evidence. *Id.* § 4209(d)(1). The judge is not bound by the jury's recommendation regarding whether the aggravating circumstances outweigh the mitigating circumstances. *Id.; see also Norcross v. State,* 36 A.3d 756, 770–71 (Del. 2011) (explaining Delaware's statutory scheme). This scheme differs from some of our sister states in which a *jury* imposes the death penalty if it unanimously concludes that an aggravating circumstance exists and unanimously concludes that the aggravating circumstances outweigh any mitigating circumstances. *See, e.g.,* 42 Pa. Cons.Stat. Ann. § 9711(c).

10. 11 *Del. C.* § 4209(e)(1)(*o*), (u).

sented testimony regarding Ploof's previous encounters with the law, his conduct in prison, and from Heidi's family.

The jury unanimously found that Ploof killed Heidi for pecuniary gain.[11] The jurors also unanimously recommended that all the aggravating evidence outweighed all the mitigating evidence. The trial judge reviewed the recommendation, found that the aggravating circumstances outweighed the mitigating circumstances, and imposed the death penalty.[12]

Ploof's counsel (Appellate Counsel) appealed the conviction, claiming that: (1) the trial judge erroneously refused to suppress evidence tainted by a *Miranda v. Arizona*[13] violation, (2) two of the State's peremptory challenges violated *Batson v. Kentucky*,[14] (3) the prosecutor's reference to Ploof's "public defender" prejudiced him, (4) the trial judge erroneously denied Ploof's motion to bifurcate the sentencing hearing, and (5) Ploof's death sentence was disproportionate to sentences imposed in similar cases.[15] We rejected each argument and affirmed the conviction.[16]

### D. Postconviction Proceedings

On July 6, 2005, Ploof filed a *pro se* motion for postconviction relief under Superior Court Criminal Rule 61. After the State filed an answer to Ploof's motion, Ploof was assigned counsel who supplemented Ploof's *pro se* motion and replied to the State's answer. That attorney was excused because of a conflict, and a new attorney was appointed and was eventually excused without having filed anything further. Finally, another attorney was as-

signed and further amended and supplemented Ploof's motion.

At the postconviction relief hearing, Ploof offered the testimony of Ashley Hurley, Ploof's daughter from a previous marriage. Hurley testified that she saw Heidi every other weekend and that they had a close relationship. She also testified that Heidi was left-handed and unhappy after losing her parental rights over her daughter. When Hurley heard that Heidi had died, she immediately suspected that Heidi had killed herself. Ploof's postconviction counsel also presented testimony from Dr. Werner Spitz, a forensic pathologist, who disagreed with aspects of Tobin's trial testimony and stated that it was possible that Heidi had committed suicide.[17]

At the postconviction hearing, Ploof presented new mitigation evidence about his childhood and his military record. Trial Counsel had investigated Ploof's upbringing, but Ploof had reported a normal childhood and his parents, Gerald and Shirley Ploof, had corroborated his story. Although Trial Counsel had a document indicating that the State of New York had involuntarily closed the Ploofs' foster home in 1984, she did not recall seeing the specific page describing the closure. Trial Counsel testified about her investigation, suspicions, and decision-making process during her representation of Ploof.

Ploof's postconviction counsel presented testimony from several former Ploof foster children and expert testimony from a psychologist. The former foster children testified that Ploof's father, Gerald Ploof (Gerald), had sexually abused them and

---

**11.** The jury voted 11–1 that the State had established that the murder was premeditated and the result of substantial planning.

**12.** *Ploof I*, 2003 WL 21999031, at *5 (Del.Super. Aug. 22, 2003).

**13.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**14.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**15.** *Ploof II*, 856 A.2d 539, 541 (Del.2004).

**16.** *Id.* at 540.

**17.** We discuss Spitz's testimony in greater detail in Part III.C.1 *infra*.

physically abused Ploof. Ploof's mother, Shirley Ploof (Shirley), was extremely strict and distant from the family. The State of New York closed the Ploofs' foster home because it received complaints that Ploof had sexual contact with the foster children.

After hearing testimony and considering the parties' submissions, the judge denied Ploof's motion for postconviction relief.[18] Ploof appealed.

## II. STANDARD OF REVIEW

 We review a Superior Court judge's decision to deny postconviction relief for an abuse of discretion.[19] When deciding legal or constitutional questions, we apply a *de novo* standard of review.[20]

## III. ANALYSIS

### A. Standards Governing Postconviction Relief Proceedings and Ineffective Assistance of Counsel Claims

 Superior Court Criminal Rule 61 governs postconviction relief motions. Rule 61 is intended to correct errors in the trial process, not to allow defendants unlimited opportunities to relitigate their convictions. There are several limitations on the availability of postconviction relief. First, defendants must file postconviction relief motions no more than three years after their conviction becomes final.[21] If a defendant asserts a ground for relief that could have been asserted in the proceedings leading to the conviction, a court cannot grant postconviction relief unless the defendant shows cause for relief and prejudice from a violation of his rights.[22] A defendant's failure to assert a claim within the time limits, or to assert a ground for relief in the proceedings leading to his conviction, will not bar postconviction relief if the defendant raises a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the proceedings' fundamental legality, reliability, integrity, or fairness.[23] Finally, a court cannot reevaluate formerly adjudicated claims unless reconsideration is warranted in "the interest of justice."[24]

 Many of Ploof's claims assert that Trial Counsel or Appellate Counsel were ineffective. We generally decline to consider ineffective assistance of counsel claims in a direct appeal so that the defendant can fully investigate the issue in a postconviction proceeding.[25] Therefore, Rule 61(i)(3) does not bar Ploof's ineffective assistance of counsel claims. To analyze these claims, we turn to the well-worn standards articulated by the United States Supreme Court in *Strickland v. Washington.*[26] *Strickland* establishes a two-pronged test to determine whether a defendant was denied his Sixth Amendment right to effective assistance of counsel.[27]

---

18. *Ploof III*, 2012 WL 1413483, at *1 (Del.Super. Jan. 30, 2012).

19. *Swan v. State*, 28 A.3d 362, 382 (Del.2011) (citing *Zebroski v. State*, 12 A.3d 1115, 1119 (Del.2010)).

20. *Id.*

21. Super. Ct.Crim. R. 61(i)(1) (1996). The Superior Court shortened the filing period from three years to one year in 2005. Super. Ct.Crim. R. 61(i)(1).

22. Super. Ct.Crim. R. 61(i)(3).

23. Super. Ct.Crim. R. 61(i)(5).

24. Super. Ct.Crim. R. 61(i)(4).

25. *Sahin v. State*, 7 A.3d 450, 451 (Del.2010).

26. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

27. *Id.* at 687, 104 S.Ct. 2052. While the Sixth Amendment is not directly applicable to the State of Delaware, the United States Supreme Court has applied the Sixth Amendment to the states through the Fourteenth

"First, the defendant must show that counsel's performance was deficient."[28] To meet this standard, the "defendant must show that counsel's representation fell below an objective standard of reasonableness."[29] "Second, the defendant must show that the deficient performance prejudiced the defense."[30] "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[31]

■■■ The United States Supreme Court has cautioned us to eliminate the "distorting effects of hindsight" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" when considering an ineffective assistance of counsel claim.[32] We measure an attorney's conduct against an objective standard of reasonableness based on prevailing professional norms.[33] Although American Bar Association standards are guides to reasonableness, they are only guides.[34] "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[35]

■■■ To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[36] "A reasonable probability is a probability sufficient to undermine confidence in the outcome"—a lower standard than "more likely than not."[37] These standards frame our analysis of Ploof's postconviction claims.

### B. Does Rule 61 Bar Some of Ploof's Claims and has Ploof Waived Certain Claims on Appeal?

#### 1. Are Ploof's Claims Time Barred?

■■■ We begin by applying Rule 61's procedural bars. First, the State argues that many of Ploof's claims are time-barred because his postconviction counsel asserted new claims by amending his initial postconviction relief motion after the Rule's three-year time period expired.[38] We reject this argument. Because Ploof filed a postconviction relief motion within three years of his conviction, his original motion was timely. The postconviction judge permitted Ploof's counsel to amend the original motion to add new claims under Rule 61(b)(6). We hold that Rule 61's time limit applies only to the initial filing, and that Rule 61 grants Superior Court judges discretion to permit defendants to amend their motions when justice so requires.[39] Ploof's claims are not time-

Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

28. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

29. *Id.* at 688, 104 S.Ct. 2052.

30. *Id.* at 687, 104 S.Ct. 2052.

31. *Id.*

32. *Id.* at 689, 104 S.Ct. 2052.

33. *Id.* at 688, 104 S.Ct. 2052.

34. *Id.*

35. *Id.* at 690–91, 104 S.Ct. 2052.

36. *Id.* at 694, 104 S.Ct. 2052.

37. *Id.* at 693–94, 104 S.Ct. 2052.

38. Super. Ct.Crim. R. 61(i)(1) (1996).

39. Super. Ct.Crim. R. 61(b)(6) ("A motion may be amended ... at any time before a response is filed or thereafter by leave of court, which shall be freely given when justice so requires."); *see also Poole v. State*, 203 Md.App. 1, 36 A.3d 513, 518 (2012) (constru-

barred.

### 2. Can Ploof Incorporate Arguments by Referencing His Superior Court Briefs?

Ploof requested an additional twenty pages of argument for his opening brief in this appeal.[40] We granted Ploof's request in part and allowed him to extend his opening brief by ten pages. Ploof proceeded to include approximately forty-five additional pages of argument by describing claims in single sentences and incorporating by reference the Superior Court briefs filed as part of his appendix.[41] The State argues that Ploof has waived those claims.

 Under Supreme Court Rule 14, an appellant waives an argument if he does not argue its merits within the body of his opening brief.[42] Our case law holds that the opening brief must "*fully* state the grounds for appeal, as well as the arguments and supporting authorities on each

issue or claim of reversible error."[43] If a party only casually mentions an issue, that cursory treatment is insufficient to preserve the issue for appeal.[44] "In order to develop a legal argument effectively, the [o]pening [b]rief must marshal[ ] the relevant facts and establish reversible error by demonstrating why the action at trial was contrary to either controlling precedent or persuasive decisional authority from other jurisdictions."[45] If a party fails to cite any authority in support of a legal argument, we will deem that argument waived.[46]

 Supreme Court Rule 14 bars Ploof's attempt to incorporate arguments by referring to the Superior Court briefs in his appendix. Rule 14's requirement that Ploof raise the *merits* of his argument within the *body* of his opening brief was clearly not satisfied by Ploof combining a conclusory statement with a reference to material outside of his brief. Other courts have also held that an appellant may not

---

ing similar language and holding that "[a]s long as the petition that begins the proceeding is timely filed, amendment of that petition is freely allowed"). We also note that the parties' appellate briefs do not address the scope of the "relation back" doctrine applicable to amendments in civil proceedings. *See* Super. Ct. Civ. R. 15(c). Unlike the federal habeas corpus statute, Rule 61's amendment provision does not explicitly incorporate civil procedure rules. *Compare* Super. Ct.Crim. R. 61(b)(6) (providing that postconviction relief motions may be amended "by leave of court, which shall be freely given when justice so requires") *with* 28 U.S.C. § 2242 (providing that applications for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"). *See also Mayle v. Felix*, 545 U.S. 644, 654–55, 662, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (interpreting the "relation back" doctrine in a federal habeas corpus proceeding). Although Superior Court Criminal Rule 57(d) incorporates civil procedure rules so long as they are not "inconsistent" with criminal procedure rules, we do not address the relationship between Superior Court Criminal Rule 61(b)(6) and Superior Court

Civil Rule 15 because the parties have not raised the issue.

40. *See* Supr. Ct. R. 14(d) (limiting opening briefs to thirty-five pages).

41. For example, Ploof argues that "his Sixth and Fourteenth Amendment rights to a fair and impartial jury were violated when the [c]ourt denied his request for a change of venue. ( [App. to Opening Br. A–1386–96] )." Opening Br. 42. This cursory description constitutes his entire argument on that claim.

42. Supr. Ct. R. 14(b)(vi)(A)(3).

43. *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 (Del.2004) (citing *Turnbull ex rel. Turnbull v. Fink*, 644 A.2d 1322, 1324 (Del.1994)).

44. *Id.* (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir.1993)).

45. *Flamer v. State*, 953 A.2d 130, 134 (Del. 2008) (citing *Rossitto v. State*, 298 A.2d 775, 778 (Del.1972)).

46. *Id.* (citations omitted).

incorporate his trial court pleadings by reference.[47] The reasons for this rule are obvious. First, incorporating arguments by reference to trial court filings does not address the trial judge's reasons for rejecting those claims.[48] Even though we review legal issues *de novo*, appellate briefs must explain why the trial judge erred and cannot ignore the judge's reasoning.[49] Second, incorporating arguments by reference to an appendix allows parties to ignore clearly established page limitations, leading to unfocused, ineffective arguments.[50] Ploof's attempt to incorporate his Superior Court filings doubled the length of his forty-five page brief, despite our having granted him additional pages. Parties may use their appendix to provide context and record support for their arguments; they cannot transform the appendix into a *de facto* brief.[51] Finally, we note that the claims incorporated by reference involve alleged violations of federal constitutional rights. Ploof's failure

to develop these arguments on appeal is inconsistent with his claim that the alleged constitutional violations are serious.[52]

We, therefore, conclude that Ploof has waived the issues he attempts to raise by referring to the Superior Court briefs in his appendix. Our rules and precedent are clear, and to hold otherwise would create a travesty of our appellate process. We consider only the issues Ploof has properly presented to us under Supreme Court Rule 14.

## C. Did Ploof Receive Ineffective Assistance of Counsel During the Trial's Guilt Phase?

Ploof argues that Trial Counsel provided ineffective representation during his guilt-phase trial. He argues that Trial Counsel should have consulted with a ballistics expert, toxicologist, and forensic pathologist in order to properly support his theory that Heidi committed suicide. Ploof also

47. *See, e.g., Northland Ins. Co. v. Stewart Title Guar. Co.,* 327 F.3d 448, 452–53 (6th Cir. 2003) (citations omitted) (condemning a party's attempt to incorporate arguments by reference and citing federal appellate decisions reaching identical conclusions); *see also United States v. Jackson,* 549 F.3d 963, 972 n. 6 (5th Cir.2008) ("Argument by reference is not permitted; an appellant who requests 'the adoption of previously filed legal and factual arguments ... abandon[s those] arguments by failing to argue them in the body of his brief.' " (alterations in original)) (quoting *Yohey v. Collins,* 985 F.2d 222, 224–25 (5th Cir.1993)); *Gladysiewski v. Allegheny Energy Serv. Corp.,* 282 Fed.Appx. 979, 981 (3d Cir. 2008) (citing *Northland Ins.,* 327 F.3d at 452); *Snyder v. United States,* 23 Fed.Appx. 212, 213 (6th Cir.2001) (citing *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir.1996)).

48. *See Gaines–Tabb v. ICI Explosives, USA, Inc.,* 160 F.3d 613, 623–24 (10th Cir.1998) ("Finally ... plaintiffs attempt to adopt the materials they filed in the district court rather than setting forth in their appellate brief their quarrel with the district court's reasoning. Like other circuit courts, we do not consider

this acceptable argument." (citations omitted)).

49. *See id.* We note that the postconviction judge addressed all of Ploof's claims in his opinion.

50. *See DeSilva v. DiLeonardi,* 181 F.3d 865, 866–67 (7th Cir.1999) ("Petitioners direct us to a document filed in the district court, but we have not read it because adoption by reference amounts to a self-help increase in the length of the appellate brief.... A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." (citation omitted)).

51. *See* Supr. Ct. R. 14(e) (requiring the appendix to "contain such portions of the trial transcript as are necessary to give this Court a fair and accurate account *of the context* in which the claim of error occurred" and "contain such other parts of the *record material to the questions presented* " (emphasis added)).

52. We also note that Ploof did not discuss any of these claims during oral argument.

contends that Trial Counsel should have presented more evidence that Heidi was ambidextrous. Ploof next asserts that Trial Counsel's questions during Deborah Jefferson's cross-examination were inconsistent with the suicide theory and prejudiced his defense. Finally, Ploof argues that Trial Counsel was ineffective because she failed to attempt to rehabilitate or object to the dismissal of prospective jurors who expressed objections to the death penalty.

We begin by addressing the ballistics, toxicology, dominant hand, and forensic pathology issues. We then proceed to analyze whether Ploof has established Trial Counsel's alleged failures constituted ineffective assistance of counsel.

### 1. Trial Counsel's Failure to Investigate Ballistics, Toxicology, and Dominant Hand Issues or to Consult with a Ballistics, Toxicology, or Forensic Pathology Expert

#### a. Tobin's Trial Testimony and the New Evidence from the Postconviction Proceedings

##### i. Ballistics Evidence

Ploof first argues that Trial Counsel was ineffective because she failed to adequately investigate ballistics evidence while preparing for trial. At trial, Tobin opined that the Ruger was fired six or seven inches away from Heidi. Tobin noted that it would be very difficult for a right-handed person to shoot herself six or seven inches away from her left side, although she admitted it was possible Heidi had committed suicide.

At the postconviction hearing, Spitz testified that investigators needed to test fire the Ruger to accurately determine its range.[53] He noted that most self-inflicted gunshot wounds are contact or very close

range. While he agreed with Tobin that Heidi's wound was not a contact wound, he opined that the gun was fired at a distance of less than five inches but more than half an inch. He also admitted that it was possible Heidi had shot herself.

##### ii. Toxicology Evidence

At trial, Tobin testified that although preliminary testing of Heidi's urine revealed marijuana and several other substances, confirmatory screenings for the other substances had come back negative. The State did not confirm the presence of marijuana because it can remain in the body for up to two weeks after use, therefore, further testing would not help investigators determine how Heidi had died. Tobin testified that the toxicology report therefore did not impact her conclusion regarding Heidi's cause of death. In contrast, Spitz opined that Heidi may have used marijuana within two days of her death. Ploof contends that this evidence would have bolstered his suicide theory.

##### iii. Evidence that Heidi was Ambidextrous

At trial, Heidi's brother testified that Heidi was right-handed. Because the brother was left-handed, he recalled adjusting his fishing pole so that Heidi could use it. Tobin also understood Heidi to be right-handed. She testified that it would be extremely difficult for a right-handed person to shoot herself on the left side of her head at the angle and distance of the gunshot. It would be very difficult for Heidi to shoot herself using her *right* hand on the *left* side of her face, and she would have had difficulty aiming the gun using her left hand. Ploof, however, testified that Heidi was ambidextrous.

---

**53.** The State argues that the police officers did test fire the Ruger, but the record reflects that the officers only fired it to confirm it was the same weapon that caused Heidi's death, not to determine the range of fire.

At the postconviction hearing, Spitz testified that Heidi might have been left-handed based on his review of two photographs of Heidi holding objects in her left hand. Trial Counsel had access to the photographs, but she did not present them. Ashley Hurley, Ploof's (but not Heidi's) daughter, testified that Heidi wrote with her left hand. Trial Counsel did not interview Hurley, but she did interview two of Heidi's coworkers, who each stated that Heidi was right-handed.

### iv. Forensic Pathology Evidence

The State presented testimony from Tobin regarding female suicide rates at trial. Tobin testified that women rarely commit suicide using a firearm. Tobin had performed thousands of autopsies during her career, but only recalled seeing five female gunshot suicides. In response to another question, Tobin stated that textbooks recommend that if a woman is found with a gunshot wound, investigators should consider it a homicide until proven otherwise. Tobin did not believe that Heidi committed suicide.

At the postconviction hearing, Ploof presented a study showing that between one-quarter and one-third of female suicides involve firearms. Another study indicated that firearms were the single most popular suicide method for women, though women were still much less likely than men to use a firearm. These studies contradicted the textbooks Tobin cited. Spitz stated that he could not determine how Heidi had died based on the materials Ploof's postconviction counsel had provided.

### b. Did Trial Counsel's Alleged Deficiencies Establish Ineffective Assistance of Counsel under Strickland v. Washington?

■ The United States Supreme Court has cautioned judges to avoid academic attempts to "grade counsel's performance." [54] Strickland is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant. [55] We therefore begin by analyzing whether Ploof has established Strickland's "prejudice" prong. [56]

### i. Ballistics Evidence

■ Had Spitz testified at trial, he could have disputed Tobin's conclusion that the fatal shot had been fired from six to seven inches away, and testified that he thought Heidi had possibly committed suicide. Spitz's testimony, however, is not as helpful as Ploof asserts. Spitz's conflicting expert testimony would merely create a factual dispute for the jury—whether the gun was held six to seven inches from Heidi or somewhere between a half inch and five inches away. Even if the jury believed Spitz instead of Tobin, this conclusion would still be several steps removed from concluding that Heidi shot herself.

Other courts have overturned convictions because an attorney failed to investigate ballistics issues, but those cases involved very different facts. In Troedel v. Wainwright, there were two defendants and the crucial issue was who fired the fatal shot. [57] The prosecution's expert tes-

54. Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

55. Id.

56. Id. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be

so, that course should be followed."); Swan v. State, 28 A.3d 362, 391 (Del.2011) (beginning a Strickland analysis with the test's prejudice prong).

57. 667 F.Supp. 1456, 1461 (S.D.Fla.1986), aff'd sub nom. Troedel v. Dugger, 828 F.2d 670 (11th Cir.1987).

**826**

tified that the defendant had fired the shot, but the defendant's expert at the federal habeas hearing showed that the prosecution's expert did not base his conclusion on the tests the prosecution conducted.[58] Because the expert's testimony was the only way that the jury could have found beyond a reasonable doubt that the defendant had fired the lethal shot, trial counsel's failure to investigate prejudiced the defendant.[59] Similarly, in *Harris ex rel. Ramseyer v. Blodgett*, two defendants were accused of killing the victim.[60] Defense counsel failed to discover that the investigating officer did not think that two people shot the victim, given the location of the entry wounds and that the officer believed the victim had collapsed immediately, making it impossible for the first shooter to pass the gun to the defendant to take a second shot.[61] This evidence would have made it unlikely that the defendant had murdered the victim.[62]

Spitz's ballistics testimony was less relevant to Ploof's case. Moreover, it did not conflict with Tobin's testimony in the same way as the new evidence in *Troedel* and *Harris*, which directly contradicted the prosecution's evidence regarding a crucial issue in the case. Here, Spitz's testimony indicated that the gun may have been slightly closer to Heidi, but this testimony was completely consistent with the State's murder theory. Spitz indicated that suicide was a possibility, but Tobin also conceded that she could not rule out suicide. This ballistics testimony may have helped Ploof's defense marginally, but it is not sufficient to establish prejudice under *Strickland*.

### ii. Toxicology Evidence

■ Ploof has also failed to establish that Trial Counsel's failure to consult with a toxicologist prejudiced him. While Tobin testified that Heidi could have used marijuana as long as two weeks before her death, Spitz believed that Heidi had used marijuana within two days of her death. Notably, Spitz did not state that Heidi was under the influence of any other drug near the time of her death. As the postconviction judge noted, even if Heidi had been under the influence of marijuana, that does not create a reasonable probability that a jury would have determined that she committed suicide.[63] The jury knew that Heidi had abused drugs and that the preliminary toxicology report indicated that Heidi may have used marijuana during the previous two weeks. Establishing that Heidi had used marijuana in the two days preceding her death does not measurably alter this analysis and, therefore, does not establish prejudice under *Strickland*.

### iii. Evidence that Heidi was Ambidextrous

■ Similarly, additional evidence that Heidi was ambidextrous would be of little benefit to the defense. If Trial Counsel had presented additional testimony and the photographs, that would have further supported Ploof's claim that Heidi was ambidextrous, and would have created a credibility question for the jury because Heidi's brother testified that Heidi was right-

---

58. *Id.* at 1462.

59. *Id.*

60. 853 F.Supp. 1239, 1256 (W.D.Wash.1994) *aff'd sub nom. Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1435–36 (9th Cir.1995) (noting that the state did not appeal the ballistics issue).

61. *Id.*

62. *See id.*

63. *Ploof III*, 2012 WL 1413483, at *7 (Del.Super. Jan. 30, 2012).

handed. The jury would not necessarily have resolved this issue in Ploof's favor. Even if the jury determined that Heidi was ambidextrous, this determination would have made the suicide theory less physically unlikely. In short, if Trial Counsel had presented the additional evidence, it would have created a credibility dispute that, if resolved in Ploof's favor, would have marginally bolstered the physical possibility of the suicide theory, but not increased the likelihood that Heidi had killed herself. Even viewed in conjunction with Spitz's opinion that the weapon had been fired slightly closer to Heidi's head, the additional testimony regarding handedness would have made only a negligible difference. The handedness evidence falls far short of establishing prejudice under *Strickland.*

### iv. Forensic Pathology Evidence

█ Nor does Trial Counsel's failure to consult with a forensic pathologist to impeach Tobin's trial testimony establish prejudice under *Strickland.* If Trial Counsel had consulted with a forensic pathologist, she could have shown that a substantial number of female suicides involve firearms and that studies contradict statements in the textbooks that a female death by gunshot can be presumed a homicide until proven otherwise.[64] While Trial Counsel's omission might be prejudicial if there had been less direct and circumstantial evidence of murder, we are satisfied that Tobin's statistical testimony played little role in the jury's decision. Ploof does not controvert Tobin's statement that she had observed only five female suicides using firearms and Ploof's studies indicate that women are much less likely to kill themselves with firearms than men. Although consulting with a forensic patholo-

gist could have called Tobin's generalized statements into question, it would not have measurably altered the balance of the evidence, which overwhelmingly favored the State's murder theory.

### v. Cumulative Prejudice

█ In sum, Ploof's new evidence might have moved his suicide theory closer to the realm of physical possibility, but it does not address the ample witness testimony, Ploof's inexplicable conduct, and the other evidence weighing in favor of guilt. If Trial Counsel had done everything Ploof now contends she should have done, the jury would have heard (1) the gun might have been fired slightly closer to Heidi's head, (2) Heidi may have used marijuana within two days of her death, (3) Heidi's stepdaughter thought Heidi was left-handed and two photographs show Heidi holding objects in her left hand, and (4) a significant percentage of female suicides involve guns.

The suicide theory Ploof offered at trial foundered on numerous grounds independent of Tobin's testimony. Ploof testified that, after seeing Heidi shoot herself, he got into the same seat where Heidi's body lay and drove her to the discount store. That testimony conflicted with the testimony of a neutral eyewitness who saw Ploof in the *passenger* seat of Heidi's car and a woman driving the vehicle. The new evidence does not alter Hendricks's testimony that Ploof had told her to move into his house on November 5, or Jackson's testimony that his wife angrily exclaimed that Ploof had tried to collect Heidi's life insurance. Nor does this new scenario address Ploof's decision to give his gun and gun case to a friend and then to tell the police

---

64. *See* J.W. Eisele et al., *Sites of Suicidal Gunshot Wounds,* 26 J. Forensic Sci. 480, 483 (1981) (stating that the study's findings contradict another author's statement that a woman who dies from a gunshot should be presumed to be a homicide victim until proven otherwise).

that he owned no guns. Even at trial, Ploof's testimony that he did not own the Ruger conflicted with that of multiple independent witnesses who stated that Ploof owned the gun. Finally, Ploof's decision to write two letters, purporting to be from Heidi's real killer and stating that Heidi had been having an affair, conflicts with his testimony that the entire reason for concealing Heidi's suicide was to protect her reputation.

Ploof cites several court decisions overturning convictions because attorneys failed to consult with experts. The expert testimony in those cases, however, fatally undermined the prosecution's expert witnesses, who provided the only corroborating evidence in the case. In *Gersten v. Senkowski,* a child sexual abuse case, the prosecution's case relied on the victim's testimony and medical experts.[65] If the defense attorney had consulted with an expert, he would have discovered that the medical evidence did not corroborate the victim's story—which was critical because the victim's testimony provided the only direct evidence.[66] In contrast to *Gersten,* Tobin's testimony was far less important to the State, which had ample direct and circumstantial evidence that Ploof murdered Heidi. Also in contrast to *Gersten,* Spitz's testimony did not conflict with the prosecution's theory of the case. Spitz noted that it was possible Heidi had committed suicide but did not state that his findings were inconsistent with murder.

Even if it was assumed that Trial Counsel's failure to present ballistics, toxicology, forensic, evidence, and dominant hand evidence fell below an objective standard of reasonableness, Ploof cannot show that Trial Counsel's alleged deficiencies prejudiced him. It was Ploof's inexplicable conduct and the contrary testimony of multiple independent witnesses that caused the jury to reject his suicide theory—not Trial Counsel's failure to dispute issues tangential to the question of how Heidi died. Even if Trial Counsel had presented the ballistics, toxicology, forensic pathology, and dominant hand issues to the jury, that would not have created a reasonable probability of a different result. Because we hold that Ploof has failed to establish prejudice under *Strickland,* we do not address whether Trial Counsel's conduct fell below an objective standard of reasonableness.

### 2. Trial Counsel's Failure to Cross–Examine Deborah Jefferson in Keeping with a Single, Coherent Defensive Theory[67]

 Ploof next claims that Trial Counsel was ineffective because her cross-examination of Deborah Jefferson was inconsistent with the defense's suicide theory. Trial Counsel asked Jefferson several questions that seemed to cast doubt on Jefferson's identification of Ploof as the man she saw on the night of Heidi's death.[68] This was allegedly inconsistent with Ploof's suicide theory, which conceded

---

**65.** 426 F.3d 588, 608 (2d Cir.2005); *see also Pavel v. Hollins,* 261 F.3d 210, 227–28 (2d Cir.2001) (holding that the petitioner had established prejudice when his attorney could have found experts who would testify that the prosecution's evidence was inconsistent with the frequency of abuse the victims alleged); *Holsomback v. White,* 133 F.3d 1382, 1388 (11th Cir.1998) (holding that the defendant had established his counsel was ineffective because expert testimony would have revealed that the child's account of the abuse was "medically impossible" (citations omitted)).

**66.** *Gersten,* 426 F.3d at 608, 611–12.

**67.** Although Ploof also incorporated this argument by referencing his Superior Court briefs, he addresses the merits of the issue in the brief's body when analyzing whether Trial Counsel's deficient performance prejudiced him, so we will consider this argument.

**68.** For example, Jefferson initially told the police that the man had a mustache and incorrectly described Ploof's clothing's color.

Ploof's presence at the discount store that night. Ploof claims this questioning prejudiced him because it undermined the credibility of his suicide theory.

This alleged deficiency also fails to meet *Strickland*'s prejudice prong. At worst, the line of questioning neither helped nor hindered Ploof's defense, because he admitted that he was at the store on the night of Heidi's death. Trial Counsel's attempts to cast doubt on Jefferson's recollection may have been "inconsistent" in the sense that Ploof conceded he was at the store, but they did not directly contradict the suicide defense. Arguably, these questions benefited Ploof, because they called Jefferson's recollection into doubt. Jefferson testified that she saw Heidi driving the car into the parking lot and saw Ploof in the passenger seat. This testimony was devastating, because Ploof claimed that he had driven the car into the parking lot and that Heidi was already dead. Trial Counsel's attempt to highlight discrepancies in Jefferson's testimony could have caused the jurors to discount her entire recollection, including her description of Heidi driving the car and Ploof riding in the passenger seat. Because any inconsistency in crossexamination was at worst neutral to Ploof and arguably beneficial to him, Ploof has not established prejudice. Even combined with the evidence dis-

cussed in Part III.C.1 *supra*, the cumulative effect of Trial Counsel's purported errors falls far short of establishing a reasonable probability of a different result.

### 3. Trial Counsel's Failure to Rehabilitate or Object to the Dismissal of Jurors Dismissed for Cause Due to Their Beliefs Regarding the Death Penalty[69]

■ Ploof next argues that Trial Counsel should have attempted to rehabilitate prospective jurors who were dismissed due to their views on the death penalty or objected to their dismissals.[70] In *Witherspoon v. Illinois*, the United States Supreme Court held that prospective jurors may not be excused for cause merely because they voiced general objections to the death penalty or had "conscientious or religious scruples against its infliction."[71] The Court clarified *Witherspoon* in *Wainwright v. Witt*, holding that a prospective juror may be excluded for cause if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[72] The prosecution does not need to prove the juror's bias with unmistakable clarity.[73] We give trial judges broad discretion in deciding whether a potential juror should be excused for cause.[74]

---

**69.** Ploof addresses Trial Counsel's conduct during *voir dire* with his guilt phase claims, presumably because *voir dire* occurred before trial. We note that any prejudice resulting from Trial Counsel's failure to rehabilitate or object to the dismissal of these jurors would only affect Ploof during the trial's penalty phase. Ploof does not argue that these jurors would have acquitted him, only that they would not have recommended that the judge impose the death penalty.

**70.** Although the postconviction hearing judge's analysis focused on Amy Kellam, Ploof's Superior Court briefing fairly presented the issue for multiple prospective jurors, so

we do not limit our analysis to Kellam. *See* Supr. Ct. R. 8.

**71.** *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**72.** *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)).

**73.** *Id.*

**74.** *Swan v. State*, 28 A.3d 362, 389 (Del.2011) (citing *Manley v. State*, 709 A.2d, 643, 655 (Del.1998)).

■ Ploof has not shown that Trial Counsel's conduct during *voir dire* prejudiced him. Both on appeal and before the postconviction judge, Ploof focuses on prospective juror Amy Kellam's *voir dire* examination. Kellam initially responded, "Yes," when the trial judge asked her if she believed a life sentence was the only appropriate punishment for first-degree murder. But, Kellam later replied, "Yes," when the trial judge inquired whether she could recommend a sentence of death if the law and evidence so warranted regardless of her personal feelings.[75] Later in the *voir dire*, however, the following exchange occurred:

The Court: Could you vote to impose the death penalty?

Kellam: Could I vote . . . no, no.

. . .

The Court: I asked you could you vote to impose the death penalty, you answered no. Would you explain why you answered no?

Kellam: Well, I don't think nobody [sic] should be given the death penalty.

The Court: Is that under any circumstances?

Kellam: Yes.[76]

Trial Counsel advised the court that because Kellam's answers were ambiguous, she would not take a position in response to the State's challenge for cause. As the postconviction judge found, despite Kellam's initial contradictory answers, she clearly stated at the end of the *voir dire* that she could not recommend the death penalty under any circumstances.[77] In light of this clear statement, the trial judge acted well within his broad discretion to excuse Kellam for cause. We cannot discern even a reasonable probability that an attempt at rehabilitation or an objection from Trial Counsel would have stood any chance of success.

Ploof's generalized ineffectiveness claims based on Trial Counsel's failure to object to Eileen Adriance's, Corey Garnett's, and Paulette Darling's exclusions for cause also fail to meet *Strickland*'s prejudice prong.[78] Adriance stated that she did not believe in the death penalty and said, "[y]es, sir, I would have a problem with that," when asked whether her beliefs would substantially impair her performance as a juror.[79] Garnett gave inconsistent answers. He initially agreed that, while he believed a life sentence was the only appropriate sentence for first degree murder, it would not impair his ability to recommend a death sentence if the law and evidence warranted it. Later, however, Garnett stated that he could not render a guilty verdict knowing that the defendant might receive the death penalty. Darling agreed that a person convicted of first-degree murder should automatically be given a life sentence and that she would vote in favor of it regardless of the judge's instructions.[80]

Under these circumstances, Ploof cannot show that Trial Counsel's failure to ask the trial judge to undertake further questioning, or to object quixotically to each juror stricken for cause, created a reasonable

---

**75.** App. to Opening Br. A–1549–50, A–1552.

**76.** *Id.* at A–1557–58 (first omission in original).

**77.** *Ploof III*, 2012 WL 1413483, at *11 (Del.Super. Jan. 30, 2012).

**78.** Ploof also stated that Trial Counsel was ineffective for failing to object to the striking of prospective juror Susan Smith for cause, however, the record reflects that the State immediately used a peremptory challenge on Smith after the trial judge denied the challenge for cause. App. to Opening Br. A–1593–94. Accordingly, Ploof's claim regarding Smith fails on prejudice grounds, because the trial judge *denied* the challenge for cause.

**79.** *Id.* at A–1545.

**80.** *Id.* at A–1566–67.

probability of a different result.[81] We reject the contention that an attorney must object to every potential juror dismissed for cause. That strategy would cause the attorney to lose credibility with the trial judge and hinder the attorney's ability to raise a meritorious objection. Ploof has not shown that Trial Counsel was ineffective by failing to rehabilitate these prospective jurors or to object to the trial judge's decision to excuse them, because Ploof has not established that the trial judge might have allowed these people to serve. Nor has he shown any reasonable probability that the trial's result would have been different.

#### 4. Ploof's Other Guilt–Phase Ineffectiveness Claims

Ploof incorporates several additional ineffective assistance of counsel claims by referencing his briefing in the Superior Court. For the reasons stated in Part III.B.2 *supra*, we conclude that Ploof has waived these claims because he did not

address these arguments' merits within the body of his opening brief.[82]

#### D. Appellate Counsel's Failure to Raise Meritorious Issues on Appeal

 Because we are remanding Ploof's penalty phase claims for the reasons discussed in Part III.F *infra*, we next address Ploof's arguments that Appellate Counsel ineffectively represented Ploof during his direct appeal. Ploof contends that Appellate Counsel was ineffective because she did not raise all "arguably meritorious" issues on appeal. A defendant's right to effective assistance of counsel extends to his appeal.[83] Although the United States Supreme Court developed the *Strickland* test to evaluate trial counsel, we also apply the *Strickland* test to evaluate appellate counsel's performance.[84]

 Although a defendant is entitled to effective assistance of counsel during an appeal, this does not mean that his attorney must raise every nonfrivolous is-

**81.** *See Keith v. Mitchell*, 455 F.3d 662, 677–78 (6th Cir.2006) (holding that a defendant could not establish *Strickland*'s prejudice prong because "any erroneous exclusion of an impartial juror was harmless because we have every reason to believe the replacement was also an impartial juror. [The defendant] does not dispute that he was convicted and sentenced by an impartial jury, and he presents no reason to think that a jury composed of a slightly different set of impartial jurors would have reached a different verdict."); *Williams v. Collins*, 16 F.3d 626, 633 (5th Cir.1994) ("[A]ny attempts at rehabilitation would have been futile because these venire members would not have been able to function properly as jurors.... Accordingly, counsel's decision not to rehabilitate these venire members or to object to their removal for cause cannot be said to be deficient performance.").

**82.** Ploof claims that Trial Counsel was ineffective for (1) failing to request a mistrial or a more detailed curative instruction following an improper comment during closing arguments; (2) not requesting additional *voir dire*

before the penalty phase because the prosecutor told the press that Ploof was a "cold-blooded killer" after the jury returned a verdict; (3) not renewing a change of venue motion; and (4) failing to request that a juror who may have fallen asleep and a juror who allegedly discussed the case with a coworker following the guilt phase of the trial be dismissed. Although Ploof also incorporates his claim regarding Trial Counsel's questioning of Deborah Jefferson via reference to his Superior Court briefs, he presents substantive argument elsewhere in his brief and therefore did not waive the claim. *See supra* Part III.C.2.

**83.** *Evitts v. Lucey*, 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

**84.** *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see also McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999) (citing *Mayo v. Henderson* 13 F.3d 528, 533 (2d Cir.1994)) (applying the *Strickland* test to review appellate counsel's effectiveness).

sue.[85] A defendant can only show that his appellate counsel ineffectively represented him where the attorney omits issues that are clearly stronger than those the attorney presented.[86] To determine whether a defendant has been prejudiced because his attorney failed to raise an issue on appeal, we begin by considering the issue's merits.[87]

Here, Ploof argues that Appellate Counsel was ineffective because she only raised five claims on appeal, instead of all "arguably meritorious" claims. Ploof's Appellate Counsel raised five claims: (1) the trial judge erroneously admitted evidence tainted by a *Miranda v. Arizona*[88] violation; (2) during *voir dire*, the prosecutor's peremptory challenges violated *Batson v. Kentucky*;[89] (3) the prosecutor's reference to Ploof's "public defender" prejudiced him; (4) the trial judge should have bifurcated the sentencing hearing; and (5) his sentence was disproportionate.[90]

Although Ploof does not identify which additional claims Appellate Counsel should have raised, he cross-references other sections of his opening brief. Ploof argues that Appellate Counsel was ineffective because she failed to appeal the trial judge's decision to dismiss for cause potential jurors who expressed their disagreement with the death penalty. Ploof cross-references the claims he attempted to raise by referring to his Superior Court filings earlier in his brief, and he appears to argue that Appellate Counsel was ineffective because she failed to raise those issues on appeal.[91] We have already concluded that Ploof waived these claims. Because Ploof merely cross-references claims he has waived, we analyze only Ploof's claim regarding jurors dismissed due to their disagreements with the death penalty.

Ploof claims that Appellate Counsel was ineffective because she failed to appeal the trial judge's decision to dismiss jurors who voiced objections to the death penalty. That claim must fail for the same reasons we rejected Ploof's parallel claim against Trial Counsel—the claim is meritless.[92] Therefore, Ploof has failed to show a reasonable probability of a different outcome on appeal if Appellate Counsel had raised the issue.[93] Because Ploof has not demon-

**85.** *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

**86.** *Fautenberry v. Mitchell*, 515 F.3d 614, 642 (6th Cir.2008) (citing *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir.2002)).

**87.** *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir.1999) (citing *Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir.1998)) ("If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance.").

**88.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**89.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**90.** *Ploof II*, 856 A.2d 539, 541 (Del.2004).

**91.** Opening Br. 18 ("Many issues were raised or came up during Mr. Ploof's trial, which [sic] could have been raised on appeal. *See* appellate counsel deficiency issues raised *supra* and *infra*.").

**92.** *See supra* Part III.C.3.

**93.** Although we do not reach whether Appellate Counsel's conduct fell below an objective standard of reasonableness, we note that other courts have rejected Ploof's contention that his counsel's failure to appeal all "arguably meritorious" issues constitutes *per se* deficient performance. *See, e.g., Fautenberry v. Mitchell*, 515 F.3d 614, 642 (6th Cir.2008) (citing *Jones v. Barnes*, 463 U.S. 745, 752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)) (holding, in a death penalty case, that "[t]he mere fact that appellate counsel confined their appeal to seven issues does not establish that counsel were ineffective; it is often best to filter out less meritorious issues so that counsel can emphasize those that present the best opportunity for relief on appeal."). While the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases may

strated prejudice, his ineffective assistance of counsel claim fails under *Strickland.*

### E. Ploof's Constitutional Claims

 Ploof raises numerous constitutional arguments, again by incorporating his Superior Court briefs by reference.[94] For the reasons discussed in Part III.B.2 *supra,* Ploof waived these arguments by failing to address the merits of the issues in the body of his opening brief. These claims are also independently barred under Rule 61, because Ploof did not assert them in the proceedings leading to his conviction and did not establish cause for these defaults and prejudice resulting from them.[95] Additionally, Ploof's *Batson v. Kentucky*[96] claim is independently barred because we addressed that issue during Ploof's direct appeal.[97] In order to invoke the "interest of justice" exception to this procedural bar,[98] Ploof "must show that subsequent legal developments have revealed that the trial court lacked the authority to convict or punish him."[99] As

the postconviction judge found, Ploof provided no reason to reconsider our holding (and failed to acknowledge its existence). He merely recites information that was available to both the trial judge and to this Court on appeal. Ploof's failure even to argue that the interest of justice requires us to reconsider our earlier holding bars him from rearguing this claim.

### F. Did Ploof Receive Ineffective Assistance of Counsel During His Penalty–Phase Trial?

Finally, we turn to Ploof's claims concerning the penalty phase of his trial. Ploof raises several ineffective assistance of counsel claims based on Trial Counsel's failure to investigate and present additional mitigating evidence during the trial's penalty phase.[100] The postconviction judge held that Ploof had not established either prong of the *Strickland* test based on Trial Counsel's conduct during the penalty phase.[101] He dismissed the prejudice argument by concluding that he could not

---

indicate otherwise, these are only guides to reasonableness, not its definition. *Bobby v. Van Hook,* 558 U.S. 4, 8 & n. 1, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (citing *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (criticizing the Sixth Circuit for treating the ABA Guidelines as inexorable commands).

94. Ploof argues that his constitutional rights were violated when (1) the State used a peremptory challenge to remove an African–American woman from the jury pool; (2) the trial judge dismissed several jurors because they would not impose the death penalty; (3) the trial judge denied his request for a change of venue; (4) the State improperly commented on his right to remain silent; (5) the State called him a "cold-blooded" killer; (6) the trial judge refused to dismiss a juror after the juror may have fallen asleep; (7) the trial judge refused to dismiss a juror who discussed the case with coworkers; (8) the State introduced evidence of Ploof's previous arrest for assault; and (9) the State used handwriting samples Ploof wrote at the State's behest

to conclude he authored two letters introduced as evidence.

95. Super. Ct.Crim. R. 61(i)(3). Although Ploof raised ineffective assistance of counsel claims for some of these arguments, which might establish cause and prejudice, Ploof has waived these claims by failing to discuss the merits in the body of his opening brief.

96. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

97. *Ploof II,* 856 A.2d 539, 547 (Del.2004).

98. Super. Ct.Crim. R. 61(i)(4).

99. *Flamer v. State,* 585 A.2d 736, 746 (Del. 1990).

100. Ploof specifically points to additional evidence regarding his military service and evidence that he grew up in an abusive home.

101. *Ploof III,* 2012 WL 1413483, at *9 (Del.Super. Jan. 30, 2012).

say "that any of the prolonged foster child information probably could have made any impact, even if presented."[102]

In *Williams v. Taylor*, the United States Supreme Court held that the Virginia Supreme Court's prejudice analysis in a penalty-phase ineffectiveness claim was unreasonable because "it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation."[103] We have remanded postconviction appeals in other cases to allow Superior Court judges to conduct a more explicit reweighing analysis.[104] Although the postconviction judge's analysis appears to be "at least an implicit reweighing"[105] of the evidence, a more thorough analysis is necessary to allow us to review the decision. The postconviction judge had the advantage of hearing live testimony and is in a better position than are we to reweigh the aggravating evidence against the sum of the mitigating evidence presented at trial and the new evidence presented during the postconviction proceedings.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the Superior Court's decision in part and **REMAND** in part for the Superior Court judge to supplement the record by reweighing the sum of the mitigating and aggravating evidence. Jurisdiction is retained.

STRINE, Chancellor, concurring.

I concur in the well-reasoned majority opinion. I write separately, however, for two reasons. First, the majority concludes that the case should be remanded because the determination made by the Superior Court regarding the application of the prejudice prong of *Strickland* as to the claim that Trial Counsel did not effectively investigate and present mitigation evidence could not be sustained on this record.[106] For reasons I will explain, I agree with that conclusion. But, the majority opinion does not explain why the Superior Court's determination that there was no *Strickland* violation in the first instance was incorrect. If Trial Counsel did not fall short of the level of performance required under *Strickland*, the Superior Court's judgment should stand because the issue of prejudice is only relevant if there was a constitutionally deficient level of performance by Trial Counsel.[107] Thus, I will ex-

---

**102.** *Id.*

**103.** 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing *Clemons v. Mississippi*, 494 U.S. 738, 751–52, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)); *Marshall v. Hendricks*, 307 F.3d 36, 115 (3d Cir.2002) ("A proper prejudice determination requires the reviewing court to reweigh the aggravating and mitigating factors with all of the corrections taken into account.").

**104.** A Superior Court judge conducted a more explicit reweighing analysis on remand in *Swan v. State*, 2011 WL 976788, at \*3–4 (Del.Super. Mar. 16, 2011).

**105.** Answering Br. 26.

**106.** *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**107.** *Id.* at 687, 104 S.Ct. 2052 ("A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.... Unless a defendant makes *both* showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (emphasis added)); *see also, e.g.*, *Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1408, 179 L.Ed.2d 557 (2011) ("*Even if* his trial counsel had performed deficiently, [the petitioner] also has failed to show that the California Supreme Court must have unreasonably concluded that [the petitioner] was not prejudiced." (emphasis added));

plain why I believe that the Superior Court's conclusion that there was no *Strickland* violation is not supported by substantial evidence. Finally, I also agree with the majority that it is optimal that the Superior Court, which had the chance to hear the evidence, should consider the *Strickland* issues again in the first instance, rather than an appellate court acting on a paper record. But, I view it as important that the analysis required of the Superior Court on remand be spelled out. With that context in mind, I will now explain how I come to the conclusion that the *Strickland* issue must be revisited, and what analysis is required to resolve that issue definitively in accordance with the applicable precedent.

Ploof claims that Trial Counsel were ineffective in presenting mitigation evidence regarding circumstances, that, if true, suggests that he was raised in horrible circumstances that could have affected his moral development. Specifically, Ploof was raised by parents who ran a foster home and who took in many children during his childhood. This foster home was closed by the State of New York because of complaints that Ploof's father had inflicted sexual and physical abuse on the foster children.[108] The evidence further indicates that Ploof's mother knew about and turned a blind eye to the sexual abuse, and that Ploof himself during his minority witnessed his father sexually abusing children who were, in essence, his foster sisters.[109] Evidence was developed suggesting that Ploof had attempted to protect these children from his father's predatory behavior.[110] The record also shows, however, that Ploof on occasion used his father as a role model.[111] Both Ploof's father and mother beat Ploof.[112]

Trial Counsel were aware that Ploof was raised in a foster home. The record also indicates that Trial Counsel were in possession of at least two reports, which, if read, indicated on their face that the State of New York shut down the foster home in 1984, when Ploof was twenty.[113] If this record had been read, Trial Counsel would doubtless have followed up and pressed further, but the evidence indicates that Trial Counsel did not read it and thus did

---

*Smith v. Robbins*, 528 U.S. 259, 289, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[The petitioner] must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of ... counsel."); *Hammond v. Hall*, 586 F.3d 1289, 1335 (11th Cir.2009) ("Having found that this ineffective assistance of counsel claim fails on the performance element, we could stop here. In the interest of completeness, however, we will address the State's alternative argument that the claim also fails on the prejudice element."); *Carpenter v. Vaughn*, 296 F.3d 138, 149 (3d Cir.2002) ("Both *Strickland* prongs must be met in order to merit relief." (citation omitted)); *Taylor v. State*, 32 A.3d 374, 385 (Del.2011) (finding that there was no violation of the first prong of *Strickland*, and stating that "[w]e therefore need not reach or address the prejudice prong issue under *Strickland* ").

**108.** *E.g.*, A–369:4–A–370:19 (Zervas) (discussing State's Exhibit 1, the last page of which indicated that the Ploof foster home was closed after two girls reported abuse).

**109.** *E.g.*, A–94:19–A–95:9 (Deyo) (describing how Ploof and Ploof's mother would be present when Ploof's father sexually touched the foster girls); A–904:19–21 (Goodwin) (describing how Ploof saw his father abusing a foster girl).

**110.** *E.g.*, A–90:5–22 (Deyo) (describing how Ploof would tell the foster children to "go take a walk" when his father was in a bad mood).

**111.** *E.g.*, A–646:7–11 (Ruhmshottel) (testifying that Ploof copied his father's habit of exposing himself to foster girls).

**112.** *E.g.*, A–894:13–A–895:14 (Goodwin).

**113.** *See* A–369:4–23 (Zervas) (discussing State's Exhibit 1); A–849:6–19 (Zervas—Cross) (discussing Defense Exhibit 23).

not understand it.[114] The failure to do so may also explain why Trial Counsel did not press Ploof's mother and father for more details about his upbringing, when Trial Counsel had the chance. Trial Counsel's suspicions were aroused when Ploof's father left a voicemail for Trial Counsel to call him back. When Trial Counsel got in touch with Ploof's father in response to the voicemail, the father then became very reticent, and said he would need to discuss with his wife whether he should talk about "it." [115] Trial Counsel wondered whether the "it" was abuse, but never undertook a deep investigation and thus did not discover the problems at the Ploof home.[116] Had Trial Counsel read the reports indicating that the foster home had been closed by the State of New York, it seems probable that Trial Counsel would have pushed for more details and could have learned of the evidence of serious sexual, physical, and psychological abuse found by post-conviction counsel.[117]

As of the time of trial preparation, it was well accepted that one of the primary duties of defense counsel in a capital case was to conduct a "thorough investigation of the defendant's background" in order to obtain mitigating evidence.[118] The Superior Court, however, concluded that Trial Counsel's efforts in seeking mitigating evidence did not "fall below an objective stan-dard of reasonableness." [119] The Superior Court found that there were no "indica-tion[s] of any problems from any source" as to Ploof's childhood, and thus ruled that Trial Counsel acted reasonably in not in-vestigating the foster home.[120] But, this finding is not, in my view, one that can be sustained on this record. The record sug-gests that Trial Counsel were in posses-sion of two documents showing that the foster home had been shut down by the State of New York, and the record also reveals that Trial Counsel had also sus-pected, from Ploof's father's odd behavior, that there might have been abuse at the home.

Although I am reluctant to conclude on a cold paper record that Trial Counsel's failure to investigate and present mitiga-tion evidence constituted a violation of the *Strickland* standard, I would not affirm the Superior Court's determination that no violation occurred. Trial Counsel's failure to investigate Ploof's childhood was not "the result of an informed tactical deci-sion." [121] Rather, the record evidence sug-gests that it was a failure by Trial Counsel to read and understand documents in their possession. The Superior Court did not consider that evidence. If Trial Counsel had known that the Ploof home had been shut down, Trial Counsel would have been required to take this into account, by doing the deeper investigative work of the sort current counsel for Ploof later did.[122] The

**114.** *See* A–369:4–A–370:19 (Zervas); A–849:16–19 (Zervas–Cross).

**115.** *See* A–373:10–A–374:10 (Zervas).

**116.** *See id.*

**117.** *See* A–369:4–A–370:19 (Zervas).

**118.** *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Un-der the guidelines propounded by the Ameri-can Bar Association, counsel is to seek miti-gating evidence even if the client initially states that he does not want to offer such evidence. Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* § 11.4.1 (1989).

**119.** *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Ploof III*, 2012 WL 1413483, at *8.

**120.** *Ploof III*, 2012 WL 1413483 at *8.

**121.** *Rompilla v. Beard*, 545 U.S. 374, 395, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

**122.** *See generally Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (holding that the trial counsel's performance was constitutionally deficient, where counsel

record before us indicates that if such an investigation had been performed, substantial evidence relevant to a sentencing hearing could have been generated and presented in an attempt to persuade the jury to recommend, and the judge to give, a life, rather than capital, sentence.

The record thus reveals a colorable basis to conclude that Trial Counsel did not represent Ploof effectively by undertaking a full and sustained effort to develop mitigating evidence, as is required under the U.S. Constitution. Although Ploof was not helpful to counsel, either in terms of pursuing a very implausible guilt phase defense or in answering questions about his childhood, Trial Counsel appear to have possessed documents that, if read, would have revealed that the Ploof foster home had been closed down. This would have likely prompted Trial Counsel to make further inquiries.

Of course, even if the Superior Court's determination that there was no constitutionally deficient performance by Trial Counsel under *Strickland* was error, we could not reverse if the Superior Court had also properly found that the ineffective assistance of counsel in developing mitigation evidence was not prejudicial.[123] But the sum total of the reasoning provided on the important issue of prejudice was:

"[N]or can it be said that any of the prolonged foster child information probably could have made any impact, even if presented. Accordingly, this argument does not satisfy *Strickland.*"[124]

This cursory reasoning, although understandable in view of the exhausting number of issues pressed on Ploof's behalf on the Rule 61 application, does not provide an adequate basis to affirm this important determination. Although it is arguably possible for this court to perform the required analysis itself, that is hazardous as we did not hear the live testimony presented in support of the application and because it is important that the trial court in the first instance undertake the required analysis.

In this area, the determination of whether prejudice exists because counsel failed to present mitigation evidence is influenced by the uniquely serious context of a capital sentencing hearing.[125] Under the U.S. Constitution, it is impermissible to make a death sentence mandatory for any crime. Rather, the sentencing authority must always have an option to consider mitigation evidence and to order a sentence other than death, if that sentencing authority determines that the mitigation evidence outweighs the evidence weighing in favor of death.[126] The weight to give to

made a limited investigation into the petitioner's background, did not prepare a social history of the petitioner, and was not aware that he had been sexually abused and raped as a child).

123. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

124. *Ploof III,* 2012 WL 1413483, at *8.

125. *See, e.g., Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) ("[The] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").

126. *E.g., Eddings v. Oklahoma,* 455 U.S. 104, 105, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (quoting *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954 (plurality opinion))); *see also Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (affirming the rule in *Eddings* ).

mitigation evidence is to be determined in the sound discretion of the sentencing judge, if a judge is entrusted by statute to make that decision.[127]

In situations when a *Strickland* violation has resulted in a failure to present mitigation evidence, the test for prejudice is whether there is a "reasonable probability" that the result of the penalty phase would have been different.[128] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[129] As applied to Delaware's capital murder statute, in which both the jury and the judge play a role in sentencing the accused, the "reasonable probability" test asks whether the mitigation evidence is of sufficient weight that, when it is considered along with the other mitigation evidence in the record and weighed against the aggravating evidence, a reasonable juror and the ultimate sentencing judge could have reached a different conclusion as to whether to recommend and impose, respectively, a life sentence rather than a death sentence.[130] That is, if with the addition of the mitigation evidence that was missing because of the *Strickland* violation, a reasonable sentencing judge could

have concluded that the mitigating factors outweighed the aggravating factors and awarded a life, rather than death, sentence, confidence in the outcome is sufficiently uncertain to constitute prejudice.

I refer to both a reasonable juror and a reasonable sentencing judge for good reason. Although Delaware amended its death penalty statute in 1991 to eliminate the prior requirement that a jury find by a unanimous vote that the murderer be put to death, our General Assembly did not wholly eliminate the role of the jury.[131] Not only must the jury unanimously perform the constitutionally required job of finding at least one aggravating circumstance, thus making the defendant death-eligible under our statute, but the jury still casts an advisory vote on whether the aggravating factors outweigh the mitigating factors.[132]

Although under our statute, the sentencing judge may impose the death penalty regardless of whether a majority or even all the jury has recommended a sentence of death, the sentencing judge is also required by statute to give such weight as it "deem[s] appropriate" to the jury's recommendation.[133] Furthermore, if the judge

127. *E.g., Eddings,* 455 U.S. at 114–15, 102 S.Ct. 869 ("The sentencer ... may determine the weight to be given relevant mitigating evidence."); *see also, e.g., Ortiz v. State,* 869 A.2d 285, 310–11 (Del.2005) (upholding a trial judge's imposition of the death penalty, and noting that sentencing decisions "involve ... human judgments ... that build discretion, equity, and flexibility into a legal system" (citations and internal quotation marks omitted)).

128. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

129. *Id.*

130. *See* 11 *Del. C.* § 4209(d); *see also Wiggins v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (ruling that where the imposition of capital punishment requires

unanimity among jurors, prejudice exists if "there is a reasonable probability that at least one juror" would have come out in favor of life).

131. *See* 68 Del. Laws ch. 189, §§ 1–6 (1991) (discussed in *State v. Cohen,* 604 A.2d 846 (Del.1992)).

132. *See Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that, if the imposition of the death penalty depends on the existence of aggravating factors, a jury must find those factors beyond a reasonable doubt); *Brice v. State,* 815 A.2d 314 (Del.2003) (upholding the constitutionality of Delaware's death penalty statute, which the General Assembly modified in light of *Ring* ).

133. 11 *Del. C.* § 4209(d)(1).

disagrees with the jury's recommendation as to whether the aggravating factors outweigh the mitigating factors, the judge is required to state her reasons "with specificity."[134] Therefore, the General Assembly's decision to continue to give the jury a role in the capital sentencing process is not one that can be ignored. Although the sentencing judge is entitled to give the jury's vote whatever weight she chooses, that does not mean that we should ground our jurisprudence in the notion that there will not be a possible difference in the weight that a sentencing judge gives to a unanimous jury recommendation favoring the death penalty, a closely divided vote, or a jury recommendation against death. The General Assembly's decision that the jury, as a cross-section of the community, should have voice in this most important of contexts is one that must influence the application of the prejudice prong of *Strickland* here.[135]

Thus, I would find that there is prejudice under *Strickland* when there is a "substantial ... likelihood" that the missing mitigation evidence, when considered along with the other mitigation evidence in the record and weighed against the aggravating evidence, could have caused a reasonable juror and the ultimate sentencing judge to have reached a different conclusion as to whether to impose a life sentence, rather than a death sentence.[136]

Despite the fact that Ploof committed an intentional murder for pecuniary gain, the U.S. Constitution required that the horrible nature of his crime be weighed against several mitigating factors in the record, which included Ploof's lengthy service to his country in our military, and his lack of any substantial previous criminal record.[137] In determining prejudice, an assessment has to be made whether a reasonable juror or sentencing judge might have reached a different conclusion if added to that balance was evidence that Ploof grew up in a home rife with sexual and physical abuse, immorality, and duplicity. Although evidence that Ploof was raised by a father who, if the evidence is reliable, was a role model for sociopathy would not excuse Ploof from responsibility for his crime, it is exactly the kind of evidence that may be considered mitigating and support a decision to impose a life, rather than death sentence.[138]

I thus agree with the majority that the Supreme Court should not determine in the first instance whether there has either been a *Strickland* violation and whether it caused prejudice. But, I think the Superior Court should be given more guidance as to the analysis required. First, the Superior Court should examine the record evidence regarding counsel's failure to discover and develop information regarding the conditions in his childhood home and determine afresh whether counsel's conduct violated the *Strickland* standard. Second, regardless of the outcome of the first inquiry, the Superior Court should reweigh

---

134. *Id.* § 4209(d)(4).

135. *See, e.g., Cohen,* 604 A.2d at 856 ("The jury sits as the conscience of the community in deciding whether to recommend life imprisonment or the death penalty." (citations and internal quotation marks omitted)).

136. *See Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) (citation and internal quotation marks omitted).

137. *See Ploof I,* 2003 WL 21999031, at *3–4.

138. Mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion).

the evidence in order to consider whether, if there was a *Strickland* violation, there was prejudice in the sense articulated.[139] If the Superior Court concludes there is prejudice, the remedy should be to order a new sentencing hearing, to be conducted with the help of a new jury.[140]

**139.** *See Williams v. Taylor,* 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing *Clemons v. Mississippi,* 494 U.S. 738, 751–52, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)). Under the precedent of the Supreme Court of the United States, and this court, it is only necessary to move on to the prejudice prong of the *Strickland* test if the court has first determined that counsel's performance was deficient. *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also, e.g., Taylor v. State,* 32 A.3d 374, 385 (Del.2011). I would instruct the Superior Court to analyze counsel's performance under both prongs on remand in order to avoid any potential for future delay.

**140.** A new sentencing hearing is the accepted remedy when a defendant suffers prejudice as a result of a violation of *Strickland* involving the failure to investigate and present mitigation evidence. *See, e.g., Hooks v. Workman,* 689 F.3d 1148, 1208 (10th Cir.2012); *Kenley v. Armontrout,* 937 F.2d 1298, 1299 (8th Cir. 1991); *King v. Strickland,* 748 F.2d 1462, 1465 (11th Cir.1984).