**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. # 1908012526 |
| | ) | |
| TYREE JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

Date Submitted: March 31, 2023
Date Decided: June 20, 2023

## ORDER DENYING DEFENDANT'S AMENDED MOTION FOR POSTCONVICTION RELIEF

Pending before the Court is Defendant's Amended Motion for Postconviction Relief. On August 19, 2019, Defendant was seized by Wilmington Police Department ("WPD") officers shortly after he was observed via Downtown Visions camera footage exiting a residence while open carrying a firearm and re-entering that residence several moments later.[1]

Downtown Visions camera footage from earlier in the day on August 19, 2019, shows that Defendant was present outside of the residence, along with co-defendant Malik Youngblood ("Youngblood"), during what appeared to be hand-to-hand drug related transactions.[2] Defendant was arrested on that date and indicted on

---

[1] *See infra* nn. 27-34 and accompanying text.
[2] *See infra* n. 18 and accompanying text.

1

eighteen counts, including three counts of possession, purchase, ownership, or control of a firearm by a person prohibited.[3]

On February 24, 2020, Defendant pled guilty to one count of possession of a firearm by a person prohibited.[4]  On July 14, 2022, Defendant filed the instant motion alleging that, pursuant to *Strickland v. Washington*,[5] his trial counsel's decision to not file a motion to suppress certain evidence fell below an objective standard of reasonableness and that, but for this deficiency, there was a reasonable likelihood he would have received a more favorable outcome.[6]

Upon consideration of the motion, trial counsel's affidavit in response to the motion, and the State's response, the record in this matter, and the applicable legal authorities, including Rule 61 of the Superior Court Rules of Criminal Procedure ("Rule 61"), the motion is denied because Defendant has not shown that trial counsel's alleged errors prejudiced the defense.

**PROCEDURAL HISTORY**

On October 14, 2019, a Grand Jury indicted Defendant on eighteen separate counts, including three counts of possession, purchase, ownership, or control of a firearm by a person prohibited, and one count of possession, purchase, ownership,

---

[3] Appendix to Amended Motion for Postconviction Relief, at A95-103 [hereinafter "A"]; 11 *Del. C.* § 1448.
[4] A110-123.
[5] 466 U.S. 668 (1984).
[6] *See* Am. Mot. For Postconviction Relief at 13-17.

or control of ammunition by a person prohibited.[7] On February 24, 2020, Defendant entered a plea of guilty to one count of possession, purchase, ownership, or control of a firearm by a person prohibited.[8] Defendant was sentenced on this date.[9]

On December 28, 2020, Defendant filed a *pro se* motion for postconviction relief and a corresponding memorandum of law on January 4, 2021.[10] On October 11, 2021, the Court ordered appointment of counsel to Defendant.[11] On July 14, 2022, defense counsel filed an amended motion for postconviction relief. On July 27, 2022, defendant's trial counsel ("trial counsel") filed an affidavit in response to Defendant's amended motion and the State filed its response on October 25, 2022. On March 17, 2023, the Court heard oral argument on the motion and requested supplemental briefing. The motion is now ripe for adjudication.

## FACTS

### I. Downtown Visions camera footage[12]

Downtown Visions surveillance cameras are installed in high crime areas within the city of Wilmington for the purpose of surveilling potential criminal

---

[7] A95.

[8] A110-126.

[9] A127-130. *See infra* for Defendant's sentence. The Court entered corrected sentence orders on January 29, 2021, and February 24, 2021. A131-140.

[10] A377-380.

[11] A398.

[12] Downtown Visions Camera footage (Aug. 19, 2019) (hereinafter "Downtown Visions"). Downtown Visions surveillance is also known as "City Watch." The time stamps as noted in this ruling are approximate.

3

activity. One such camera was installed on the 200 block of North Harrison Street.[13] This camera captured within its scope, 208 North Harrison Street, Wilmington, Delaware 19805 ("the residence"), where an individual later identified as Malik Youngblood ("Youngblood") was a resident.[14] Sergeant Coleman ("Coleman") of WPD had been watching a live feed of this footage on August 19, 2019.[15]

The camera footage captured Youngblood and another individual later identified as Tyree Jackson ("Defendant") engaged in various activities on the porch and sidewalk out front of the residence throughout the day.[16] In the video recording, Defendant is wearing a white t-shirt with an orange in color lanyard around his neck, light gray sweatpants and black sneakers.[17] The footage captured activities that appeared to be drug transactions involving both Youngblood and other individuals.[18] Defendant was present and nearby for some these activities, but not directly involved in the transactions.[19]

---

[13] A32.

[14] *See generally* Downtown Visions; A23-24, A169.

[15] Am. Mot. Postconviction Relief at 3; A23; *see* Supp. Resp. to Am. Mot. for Postconviction Relief at 5-6.

[16] *See generally* Downtown Visions.

[17] *See generally* Downtown Visions.

[18] Downtown Visions (9:24-9:33; 9:55-9:57; 11:06-11:09); *see* A32, A171 ("In reviewing surveillance footage of the 200 block of N Harrison St. prior to officers contacting with the occupants of 208 N. Harrison St, your affiant [Patrolman Chambers] observed Youngblood engaging in several hand to hand transactions with subjects in the area.").

[19] *See supra* n. 18.

Around 9:24 a.m., Downtown Visions recorded an individual of unknown identity pull up to the residence in a black Pontiac and transfer to Youngblood a blue in color bag with a DAP logo on the side.[20] Youngblood took the bag into the house while Defendant spoke to the individual on the sidewalk.[21] Youngblood walked out several minutes later, and somewhat covertly passed what appeared to be cash to Defendant who gave it to the individual who arrived in the black Pontiac.[22] This bag was later recovered by WPD police officers after Youngblood and Defendant were apprehended.[23] Youngblood admitted in his post-Miranda interview that he placed the 9 mm Beretta handgun, .357 revolver, heroin, PCP, and ammunition into the blue DAP logo bag and that he placed this bag behind the fence in his rear yard.[24]

Around 11:24 a.m., Defendant and Youngblood quickly ran into the residence in response to seeing an individual nearby with a handgun.[25] About a minute later, the video shows Defendant running out of the residence and down North Harrison street with a black in color handgun in plain view.[26] Defendant is initially holding the firearm in his right hand with the barrel pointed toward the ground as he is

---

[20] Downtown Visions (9:24-9:33).
[21] Downtown Visions (9:32:30-9:33).
[22] Downtown Visions (9:32:30-9:33).
[23] A175.
[24] A30.
[25] Downtown Visions (11:24:45-11:45); A194-195.
[26] Downtown Visions (11:25-11:26).

walking toward the intersection and on his walk back to the residence switches the firearm to his left hand, then back to his right.[27]

Defendant stands on the corner of North Harrison and Second Street for a few moments before turning around and walking back toward the residence.[28] As Defendant is walking back toward the house, the video zooms in and provides a clearer picture of Defendant and the object Defendant was holding in his right hand.[29] Defendant is still wearing the clothes described above, including the orange lanyard, in this section of the recording.[30] Defendant stands on the porch for a few moments with Youngblood and another individual before re-entering the residence.[31]

Shortly thereafter, police vehicles arrive at the scene and a K9 is led down the side of the building.[32] At approximately 11:45 a.m., in response to a WPD call out, Defendant walks out of the residence with his hands raised in the air.[33] In apparent compliance with officer demands, Defendant gets down on his knees and lays face down on the sidewalk.[34] Defendant is then placed in handcuffs and escorted out of

---

[27] Downtown Visions (11:25-11:26).
[28] Downtown Visions (11:25:17-11:25:34).
[29] Downtown Visions (11:25:42).
[30] Downtown Visions (11:25-11:26).
[31] Downtown Visions (11:25:56-11:28:20).
[32] Downtown Visions (11:29-11:32:15).
[33] Downtown Visions (11:45:45).
[34] Downtown Visions (11:45:15-11:46).

view of the camera's scope.[35]  Youngblood exits the residence with his hands up shortly after Defendant exits the residence.[36]

**Affidavit of Probable Cause to Search the Residence**

On August 20, 2019, Patrolman Chambers ("Chambers") applied for an arrest warrant for Defendant.[37]  The Affidavit of Probable Cause attests that Coleman was watching the Downtown Visions camera in the area of the 200 block of North Harrison Street and that he "observed a black male wearing a white t-shirt with a orange lanyard around his neck and gray sweatpants holding a black handgun in his right hand" enter the residence.[38]  Chambers attests that he responded to the scene to locate the suspect and that he and other officers surrounded the residence and called out for the occupants to exit the residence.[39]  Approximately ten minutes later an individual later identified as Defendant exited the residence.[40]  Coleman confirmed that the individual exiting the residence was the same individual he observed with a gun in his possession approximately 15 minutes earlier.[41]  The individual provided

---

[35] Downtown Visions (11:45:35-11:46).

[36] Downtown Visions (11:45:30).  Defendant subsequently consented to a post-Miranda interview with Detective Silvers.  In the interview, Defendant admitted to buying a .357 magnum revolver on August 19, 2019, that the revolver was contained in a blue DAP bag, and that the individual in the black Pontiac sold him the gun.  Defendant also stated that he arranged the purchase.

[37] A7-A17.

[38] A13.

[39] A13.

[40] A13.

[41] A13.

his name as "Tyree Jackson," and date of birth as January 16, 1975.[42] Officers confirmed this information at the scene through a rapsheet.[43] Officers conducted a criminal history which revealed that Defendant was a person prohibited from possessing a firearm.[44]

While clearing the residence, other officers identified several marijuana plants that were being grown in the basement of the residence.[45] A search warrant of the residence was obtained that day.[46] Several items were seized pursuant to the search, including a red iPhone, large quantities of heroin and marijuana, firearm ammunition, one black 9 mm beretta handgun, one .357 magnum revolver, and one black Ruger .223 ranch rifle.[47]

## II. Plea Agreement

Defendant pled to one count of possession of a firearm by a person prohibited in exchange for the State dismissing all other pending charges, and on the agreement

---

[42] A24.

[43] A13.

[44] A13.

[45] A21.

[46] A27.

[47] A28. Defendant's preliminary hearing was held on August 27, 2019. During this hearing, Detective Chambers testified about the events of August 19, 2019. Much of Defendant's Motion challenges whether Defendant was arrested or detained, and when WPD learned Defendant's identity. Because the Court ultimately finds that Defendant suffered no prejudice under a *Strickland* analysis, the Court does not need to make a finding regarding whether Defendant was detained or arrested and when WPD learned of Defendant's identity.

that the State would not file a habitual offender petition.[48]  Defendant was sentenced to fifteen years at Level V suspended after ten years at Level V for six months at Level IV (Department of Correction discretion), for one year of supervision at Level III (hold at supervision Level V), for supervision Level IV (DOC discretion).[49]  Ten years is the minimum mandatory period of incarceration for the possession of a firearm by a person prohibited.

## STANDARD OF REVIEW

### I.  Rule 61

Rule 61 of the Superior Court Rules of Criminal Procedure provides a postconviction remedy for persons in custody under a sentence of the Superior Court who have a sufficient factual and legal basis for a collateral attack for upsetting final judgments.[50]  The purpose of Rule 61 is to provide defendants with a means to correct errors in the trial process.[51]  Before addressing the merits of a motion for postconviction relief, the Court must address whether there are any procedural bars.[52]  If the Motion is procedurally barred, it must be dismissed pursuant to Rule 61(i).[53]

---

[48] A124.
[49] A136-137.
[50] *Mason v. State*, 725 A.2d 442 (TABLE), 1999 WL 93283, at *1 (Del. 1999).
[51] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[52] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).
[53] Del. Super. Ct. Crim. R. 61.

The procedural bars do not apply to this Motion for Postconviction Relief. This motion is not barred pursuant to Rule 61(i)(1) because Defendant filed it within one year after the judgment of conviction was final. Rule 61(i)(2) relating to successive motions does not apply to this case because it is Defendant's first Motion for Postconviction Relief. Rule 61(i)(3) does not apply to the instant motion because Defendant's claims amount to ineffective assistance of counsel. Such claims are not subject to procedural default because they cannot be asserted in proceedings leading to judgment of conviction nor raised in any direct appeal.[54] Ineffective assistance of counsel claims are properly brought in motions for postconviction relief "because they argue that counsel's defaults precluded the prior proceedings from being a fair resolution of guilt in accord with then applicable legal principles."[55] Rule 61(i)(4) does not bar Defendant's motion because his claim of ineffective assistance of counsel has not been formerly adjudicated.

## II.   Standard Governing Ineffective Assistance of Counsel Claims

In evaluating claims for ineffective assistance of counsel, Delaware courts follow the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*.[56] The movant must show that: (1) counsel's performance was deficient, and (2) that such deficiency prejudiced the defense.[57] To establish

---

[54] *Flamer v. State,* 585 A.2d 736, 753 (Del. 1990).
[55] *Id.*
[56] 466 U.S. 668 (1984).
[57] *Ploof v. State*, 75 A.3d 811, 821 (Del. 2013) (citing *Strickland*, 466 U.S. at 668).

10

prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[58] "A reasonable probability is a probability sufficient to undermine confidence in the outcome"—a lower standard than "more likely than not."[59] "[T]here is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant."[60] A court should begin its analysis, therefore, by determining whether a defendant has established that his trial counsel's errors prejudiced the defense.[61]

As to the first prong of the *Strickland* test, counsel's performance is deficient if representation fell below an objective standard of reasonableness.[62] The burden is on the movant to show that counsel's performance is objectively unreasonable.[63] The Court's review of counsel's performance is highly deferential and involves "a

---

[58] *Id.* (citing *Strickland*, 466 U.S. at 694).

[59] *Id.* (citing *Strickland,* 466 U.S. at 693-94).

[60] *Id.* at 825 (citing *Strickland*, 466 U.S. at 697). This is especially so in the context of a plea. In the context of a guilty plea, a defendant must show that counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have insisted on going to trial, and that trial would have resulted in an acquittal. *State v. Johnson*, 2013 WL 5883211, at *2 (Del. Super. Aug. 16, 2013) (citing *Strickland*, 466 U.S. at 687)

[61] *Ploof*, 75 A.3d at 821.

[62] *Strickland*, 466 U.S. at 669.

[63] *Green v. State*, 238 A.3d 160, 174 (Del. 2020).

strong presumption" that counsel's conduct falls "within the wide range of professional competent assistance."[64]

Whether counsel's conduct was reasonable depends on the facts of the particular case.[65] Pursuant to *Strickland*, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate that conduct from counsel's perspective at the time."[66] The Court must evaluate trial counsel's performance as a whole.[67] The Court's review "'has nothing to do with what the best lawyers would have done…[or] even what most good lawyers would have done'" in a given situation.[68] The Court asks only if any reasonable lawyer would have acted as the lawyer did.[69]

## ANALYSIS

Defendant's motion focuses on the first prong of the *Strickland* test and argues that his case merits postconviction relief because his trial counsel's performance fell below an objective standard of reasonableness. In response to the motion, Defendant's trial counsel filed an Affidavit. In the affidavit, trial counsel averred that there was no meritorious basis to file a motion to suppress Defendant's

---

[64] *Ray v. State*, 280 A.3d 627, 641 (Del. 2022).
[65] *Id.*
[66] *Id.* (citing *Strickland*, 466 U.S. at 669).
[67] *Green*, 238 A.3d at 174 (citing *Atkins v. Zenk*, 667 F.3d 939, 945 (7th Cir. 2012)).
[68] *Id.* at 178 (citing *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).
[69] *Id.* at 174.

statement and physical evidence gathered pursuant to the search warrant, because the video surveillance showed that Chambers had reasonable articulable suspicion to detain Defendant without first determining Defendant's identity. Trial counsel averred that the surveillance showed Defendant entering and exiting the residence with a handgun in plain view, and that it captured Youngblood conducting several drug transactions earlier that day when Defendant was present or nearby:

> "Thus, reasonable articulable suspicion existed that drugs were in the North Harrison Street residence that actively were being sold by Co-Defendant Youngblood and that the handgun also was in the residence that could have been used to protect the drugs being sold or monies obtained from drug sales. When Defendant Jackson was observed exiting [*sic*] residence from which drugs were being sold by Youngblood, ample reasonable and articulable suspicion existed for his detention based on the foregoing facts . . . Counsel did not reasonably believe that a suppression motion would have been successful in light of the multiple drug transactions that had been observed being conducted by Youngblood on the front porch of the residence in which Defendant Jackson was present with a handgun."[70]

It is not necessary, however, "to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant."[71] For a defendant to succeed on an ineffective assistance of counsel claim, a defendant must show

---

[70] Aff. of Trial Counsel at 6.
[71] *Ploof v. State*, 75 A.3d 811, 825 (Del. 2013).

13

prejudice to the defense, therefore, courts begin their analysis with the second prong.[72] If there is no prejudice, the analysis ends.

For the reasons that follow, Defendant has not shown that his trial counsel's decision to not file a motion to suppress caused prejudice to the final outcome or would have resulted in an acquittal. For this reason, the Court declines to make a finding as to whether trial counsel's performance fell below an objective standard of reasonableness.

Pursuant to *Strickland*, the Court will analyze prejudice to the outcome by asking, but for counsel's alleged deficient performance, was there a reasonable probability that the outcome would have been different. As applied to this case, the relevant question is, but for trial counsel's decision to not file a motion to suppress evidence recovered from the residence and Defendant's post-Miranda statement, would Defendant have received a more favorable verdict relative to the plea into which Defendant entered? After a comprehensive review of the factual record, the Court does not find that there is a reasonable probability that Defendant would have received a more favorable outcome than the plea that he accepted.

Defendant pled to one count of possession of a firearm by a person prohibited in exchange for the State dismissing all other charges and agreeing to not file a petition for habitual offender status. There is a reasonable probability that Defendant

---

[72] *Id.*

would have been convicted on this count of the indictment considering the elements of the crime and the evidence available to the State to prove those elements beyond a reasonable doubt. For a trier of fact to have found Defendant guilty of this charge, they would have been required to find that: (1) the Defendant possessed, purchased, owned, or controlled a firearm; and that (2) the Defendant had a prior felony conviction on the date in question.[73] The State possessed evidence to prove these elements. In all likelihood, such evidence would have been admissible at trial. There is nothing in the record to suggest, and Defendant has not argued, that the Downtown Visions footage was subject to suppression pursuant to the Fourth Amendment or exclusion pursuant to the Delaware Rules of Evidence.

The Downtown Visions camera footage made a clear real-time recording of Defendant exiting the North Harrison Street residence with what can be clearly depicted as a black in color firearm in his right hand, in plain view, with the barrel pointed toward the ground.[74] The camera also records Defendant standing at the corner of the intersection with this firearm before walking back up the sidewalk and re-entering the residence.[75] In this section of the recording, Defendant is wearing light gray sweatpants and a white t-shirt with an orange lanyard around his neck.[76] Had Defendant proceeded to trial, this section of the video provides more than

---

[73] 11 *Del. C.* § 1448.
[74] *See supra* nn. 27-30.
[75] *Id.*
[76] *Id.*

15

sufficient evidence for a trier of fact to attain an accurate visual representation of the individual depicted and compare this image to an in-court identification of Defendant. With respect to Defendant's prohibited status, there was irrefutable evidence that Defendant had a 2012 felony conviction for manufacturing, delivery or possession with intent to deliver a controlled substance, a class D felony.

There is more than a reasonable probability that the trier of fact would have found the State proved these two elements beyond a reasonable doubt, an outcome that would have been no more favorable than the plea offer Defendant accepted. It is highly unlikely Defendant would have received a more favorable outcome, especially considering the other pending charges, Defendant's habitual offender status, and Defendant's lack of standing to suppress evidence recovered from the residence.

## CONCLUSION

Postconviction relief alleging ineffective assistance of counsel must be denied when the Defendant has failed to show prejudice from those alleged errors. Because Defendant has not shown the reasonable possibility of a more favorable outcome had trial counsel filed a motion to suppress, this motion is DENIED.

IT IS SO ORDERED.

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**