# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE    )
                     )
       v.             )      ID No. 1510018545A
                     )
ANDREW ALLEN,        )
                     )
      Defendant.    )

Submitted: November 12, 2024
Decided: February 7, 2025

*Upon Defendant Andrew Allen's Motion for Postconviction Relief*
**DENIED.**

## MEMORANDUM OPINION

Amanda D. Buckworth, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, 820 North French Street, 7th Floor, Wilmington, DE 19801, Attorney for the State of Delaware.

Herbert W. Mondros, Esquire, RIGRODSKY LAW, P.A., 300 Delaware Avenue, Suite 210, Wilmington, DE 19801, Carl Schwartz, Esquire, WISEMAN & SCHWARTZ, The Cast Iron Building, 718 Arch Street, Suite 701 N, Philadelphia, PA 19106, Attorneys for Defendant Andrew Allen.

**WHARTON, J.**

# I. INTRODUCTION

Defendant Andrew Allen ("Allen") was convicted by a jury of Home Invasion, Robbery First Degree, Assault Second Degree, Burglary Second Degree, four counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy Second Degree.[1] After an unsuccessful direct appeal,[2] Allen now moves for postconviction relief under Superior Court Criminal Rule 61.[3] Originally, his motion raised five claims, three of which alleged ineffective assistance of counsel ("IAC"), a fourth reprised his unsuccessful direct appeal *Brady* claim, and the fifth alleged cumulative error.[4] Of the IAC claims, one faults John S. Malik, Esquire ("Trial Counsel") for failing to call certain independent witnesses and the other two repackaged his unsuccessful direct appeal jury instruction arguments as IAC claims.[5] He asked the Court to grant him an evidentiary hearing on all contested issues of fact

---

[1] Allen also was indicted for Possession of a Firearm by a Person Prohibited ("PFBPP"). The PFBPP charge was severed into a "B" trial, and the parties and the Court anticipated that the "B" case would be tried in front of the same jury immediately after the "A" case. Trial in the "A" caser, took longer than anticipated, however. Trying the "B" case before that jury would have required asking the jurors to return for a sixth day - the day before Thanksgiving. Therefore, the Court excused the jury with intention of trying the PFBPP charge before another jury. *State v. Allen,* 2019 WL 4740842 at n.1, (Del. Super. Ct. Sept. 24, 2019). On September 25, 2019, the State entered a *nolle prosequi* on that charge.
[2] *Allen v. State*, 2021 WL 3012892 (Del. 2021).
[3] Mot. for Postconviction Relief, D.I. 87; This case was originally assigned to another judge of this Court. On May 15, 2023, this case was reassigned to this judge.
[4] *Id.*
[5] *Id.*

and to vacate his convictions and sentences. After carefully considering the Motion, the Court granted his request for an evidentiary hearing, but limited it's scope to his IAC claim that Trial Counsel should have called certain witnesses at trial and his *Brady* claim. The Court denied all of his other postconviction claims. On July 25, 2024, the Court held an evidentiary hearing. In his post-hearing submission, Allen withdrew his *Brady* claim, leaving only his IAC claim for consideration.[6] After giving careful consideration to the parties' arguments and the record, for the reasons set forth below, Allen's IAC claim is **DENIED.**

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The facts and procedural history prior to Allen's direct appeal are set out in comprehensive detail in the Trial Judge's post-trial Opinion denying Allen's Motion for Judgment of Acquittal. In light of the issues to be resolved in this Motion, it is helpful to set them out again here.

> Allen and his co-defendant, Jeremy Clark, were indicted on January 4, 2016 on charges of Home Invasion, Robbery First Degree, Assault Second Degree, Burglary Second Degree, four counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy Second Degree. The charges stemmed from an incident that took place on July 15, 2015 at a home in Wilmington, Delaware. Clark and Allen were not tried at the same time because Allen was not arrested until after Clark's trial. In September 2016, a jury found Clark not guilty of all the indicted charges. On November 20, 2018, after a five-day trial, a

---

[6] Def.'s Post-Hrg. Mem., at 1, D.I. 113.

jury convicted Allen of all the charges against him. Allen filed a timely motion for judgement of acquittal.

At trial, the State presented evidence that Clark and Allen forced their way into a residence on July 15, 2015 and committed various crimes in the residence before fleeing. Troy Williams testified for the State that he was at home alone on July 15, 2015 at approximately 1:00 p.m. when he heard a knock on his front door. From the window, Williams saw a man at the front door holding a pizza box and wearing a Yankees baseball cap. Williams also saw a white Chevrolet sedan with a New York license plate parked in his driveway. Believing the person at the door was a delivery man who came to the wrong address, Williams opened the door. The individual outside then displayed a firearm and attempted to force his way into the home. Williams resisted, but had trouble maintaining his footing because pizza had spilled onto the floor during the struggle. The individual outside ultimately gained entry with the assistance of a second man.

Williams testified the two assailants forced him to the floor at gunpoint and duct taped his legs together and his hands behind his back. One of the assailants then guarded Williams at gunpoint while the other searched the home. When Williams attempted to move, the guard struck Williams in his head and ear with the firearm. The two assailants searched the home and repeatedly demanded Williams tell them where his drugs and money were hidden. During the search, Williams overheard portions of a phone conversation between the assailants and a third individual, who Williams perceived was giving the two assailants instructions. The two assailants also threatened to wait until Williams' wife returned home from work, insinuating that Williams would reveal the location of his drugs and money once his wife's safety was in jeopardy.

The threats about his wife prompted Williams to attempt to fight back. After persuading his guard to move him from the floor to a chair, Williams broke free of the duct tape

that was binding him and grabbed a gun that one of the men had left lying on the desk. The gun, however, would not fire, and Williams continued to struggle with the two assailants before breaking free and running upstairs. Williams then retrieved a revolver hidden in his bedroom, started running back downstairs, and began firing at the two assailants, who were running out of the house. One of Williams' shots embedded in the floor of the entryway.

Williams believed it was possible another of the shots hit one of the assailants. He observed the two assailants flee to the white Chevrolet that he previously saw in his driveway, at which point the car quickly drove away. After the men fled, Williams first called his wife at work and told her to come home immediately. Williams then called his close friend. Approximately 10-15 minutes after the two assailants left, Williams called the police. After police and an ambulance arrived, Williams received medical attention for the injuries caused when he was struck with the gun and during his struggle to get away from the two assailants.

The defense cross-examined Williams to cast doubt on his credibility. Williams acknowledged he previously was convicted of a felony drug-related offense and lost his job as a Chester City firefighter as a result. Williams again admitted during cross-examination that he was not forthcoming with police about the fact that he fired a gun at the fleeing assailants, explaining he was hesitant to be truthful because he knew he was not supposed to possess a firearm as a result of his past felony conviction. Williams testified it was not until approximately six weeks after the incident that he told police he fired at, and likely hit, one of the assailants. The defense also questioned Williams regarding his finances, specifically his wherewithal to maintain his lifestyle exclusively on income from his rental properties and his wife's job. Williams' testimony revealed that he paid off the mortgage on his home in five years and he owned various other rental properties that he managed. Williams and his wife also owned four vehicles

and had a pool installed at their home. The defense suggested to the jury that the only possible explanation was that Williams was dealing drugs to supplement his legal sources of income.

Although Allen's pending motion focuses exclusively on Williams' credibility, Williams' testimony was not the State's only evidence. The jury also heard evidence during the State's case regarding the Delaware State Police investigation. Detective Timothy Harach of the Delaware State Police processed the crime scene, including taking pictures and collecting evidence. Detective Harach found duct tape pieces on Williams' legs and wrist, in the office, and in Williams' upstairs bedroom. The detective also found several pizza slices on the hall floor along with a [torn] pizza box. Police located a roll of duct tape and two firearm magazines in the office and a bullet in the entryway floor near the front door. In the laundry room, police also found a cell phone belonging to Jeremy Clark. Detective Harach processed the duct tape roll and the pizza box for fingerprints and found possible useable prints on both items. The detective then sent those items to the State Bureau of Identification for further processing and investigation.

Anthony DiNardo, a fingerprint examiner, testified that he matched Clark's fingerprint to the fingerprint recovered from a piece of duct tape and matched Allen's fingerprint to the fingerprint on the pizza box. DiNardo testified he was 100 percent certain about both matches.

The jury also heard evidence regarding cell tower records for Allen's phone and a forensic examination of the cellphone found at the scene. The cell tower records showed that Allen's phone hit off a tower in Philadelphia in the morning of July 15, 2015, and between 10:46 a.m. and 2:49 p.m. Allen's phone repeatedly hit off a cell tower near Williams' residence. At 2:57 p.m., the phone hit off a tower north of the tower near Williams' residence,

5

indicating the phone was moving in a northerly direction. At 3:33 p.m. and 3:58 p.m., Allen's phone hit off cell towers in the Philadelphia area.

Police also analyzed the phone left in Williams' home and discovered it belonged to Clark. After forensically examining the phone, investigators found text messages and phone calls between Clark and Allen, along with communications between Clark and two other individuals, "Sadiqq" and "Gees 2." There were numerous communications between Clark and those three individuals on the day of incident, including a message Clark sent to Gees 2 that stated, "Tape and rope."

At the close of the State's evidence, Allen made an oral motion for judgment of acquittal, arguing the State failed to present a prima facie case that Allen committed any of the charged crimes as opposed to merely being present at the scene. The Court denied that motion, finding the State presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Allen committed the charged crimes either as a principal or as an accomplice.

The defense's theory of the case, offered largely through Jeremy Clark's testimony, was that the July 15, 2015 incident at Williams' home was a drug deal gone awry. Clark testified that Williams was Clark's cocaine supplier and that on July 15, 2015, Clark purchased a large quantity of cocaine from Williams for approximately $10,000. Clark explained that he brought Allen along with him for the purchase in order to introduce Allen to Williams. Clark testified that he and Allen went to Williams' home that morning, purchased the cocaine, waited for Williams to count the money, and then Clark and Allen drove back to Pennsylvania to give the cocaine to Clark's uncle, Sadiqq, who "cooked" the cocaine to make crack cocaine for street sales.

6

Clark further testified that while he was at Sadiqq's house, Williams called Clark and demanded he return to Williams' home immediately because there was a "discrepancy." Clark stated he returned to Delaware with Allen and a second friend nicknamed "Gees." While Gees and Allen waited in the car, Clark entered Williams' home, where Williams accused Clark of using counterfeit money to purchase the cocaine that morning. Williams demanded that Clark pay $5,000 cash immediately. Clark testified Williams became enraged and threatened Clark with a gun, at which point Clark called his uncle and allowed Williams to speak with him. Williams purportedly did not return Clark's phone and instead began restraining Clark with duct tape. The two men struggled during this encounter, and Clark testified he struck Williams' head with the scale that Williams previously used to weigh the cocaine. Clark ultimately freed himself from the duct tape and ran out of Williams' residence as Williams was firing a gun at him.

Clark was shot one time in his shoulder but fled to the car where Allen and Gees were waiting. Allen and Gees drove Clark to Temple University Hospital in Philadelphia, where he was treated and released. While at the hospital, Clark was questioned by Philadelphia police regarding the origins of the gunshot wound. Clark lied and said he was shot by an unknown assailant while walking through Philadelphia.

To explain the State's fingerprint evidence, Clark testified there was a pizza box on Williams' desk that Allen picked up and moved to give Williams room to count the money during the initial drug purchase. As to the "tape and rope" text message Clark sent on the morning of July 15, 2015, Clark explained that Williams called Clark that morning and asked him to bring duct tape and rope with him to the house. Clark said he tried to make a shopping list on his phone, but accidently created a text message to Gees instead.

The State cross-examined Clark about his past felony convictions. Clark also admitted on cross-examination that after the July 15, 2015 incident, he sent his then-girlfriend to pay Williams money. Clark denied he was trying to bribe Williams and testified he simply was trying to repay Williams the money that Williams believed he was owed. Clark also acknowledged that he saw all the police reports and evidence in the case before testifying.

In its rebuttal case, the State offered a videotaped statement that Allen gave the State police on July 25, 2017. Through that statement, the State pointed out several inconsistencies between Clark's and Allen's versions of the events of July 15, 2015. The inconsistencies included that: (1) Allen stated he met Clark through an individual named Mike, while Clark denied knowing anyone named Mike; (2) Allen told police he and Clark stopped for pizza and cheesesteaks before going to Williams' house on the morning of July 15, 2015, but Clark denied ever doing so; (3) Allen denied ever entering Williams' home, but Clark insisted Allen was in the home that morning and picked up a pizza box from the desk; (4) Allen said only he and Clark drove to Williams' home, but Clark testified Gees was with them; (5) Allen said he and Clark only went to Williams' home once, but Clark said they visited on two separate occasions that day; (6) Allen denied knowing Clark was involved with any drugs other than marijuana, but Clark testified Allen was present when Clark purchased cocaine from Williams and when Clark later gave the cocaine to Sadiqq to "cook."[7]

Allen's direct appeal to the Delaware Supreme Court was unsuccessful.[8] This postconviction relief motion followed.[9] On April 15, 2024, this Court issued a

---

[7] *State v. Allen,* 2019 WL 47480842, at *1-4 (Del. Super. Ct. Sept. 24, 2019).
[8] *Allen v. State,* 2021 WL 3012892 (Del.)
[9] Mot. for Postconviction Relief, D.I. 87.

Memorandum Opinion resolving most, but not all of Allen's postconviction claims.[10] In that decision, the Court granted Allen's request for an evidentiary hearing, but only on two issues: (1) Trial Counsel's failure to call certain witnesses; and (2) Allen's *Brady* claim. In all other respects, it denied the Motion.[11]

On July 25, 2024, the Court held an evidentiary hearing on the two remaining issues. At that hearing, the Court heard testimony from five witnesses and received 10 exhibits into evidence. Allen presented the testimony of four witnesses – Allen's Trial Counsel, independent witnesses Alexander Manoogian ("Manoogian") and Lyndee Yorek, ("Yorek"), formerly Baldwin, and the complaining witness, Troy Williams. The State called former State Police Detective Steven Rizzo ("Det. Rizzo"). All but Det. Rizzo testified regarding Allen's IAC claim. Det. Rizzo's testimony addressed the *Brady* claim as did a portion of Williams' testimony. The exhibits, all introduced by the defense, consisted of excerpts from police reports and trial transcripts, 911 calls, photographs, and videos. The relevant evidence will be discussed in detail in the context of the particular claims.

After the hearing and the preparation of the transcript, the parties submitted memoranda in support of their positions. Briefing was completed on November 12, 2024.

---

[10] *State v. Allen*, 2024 WL 1654514 (Del. Super. Ct. Apr. 15, 2024)
[11] *Id.*

## III. THE PARTIES' CONTENTIONS

In his remaining IAC claim, Allen contends that "Trial Counsel was ineffective under the Sixth Amendment and Article I, Section 7 of the Delaware Constitution for failing to introduce evidence, provided in discovery and introduced at co-defendant Jeremy Clark's ("Clark") earlier trial, that "powerfully corroborated" the defense theory that Clark was the only person inside Williams' home on the afternoon of July 15, 2015."[12] Allen concedes that he was in Williams' house earlier in the day and returned later when the relevant incident occurred, but did not enter Williams' house. Instead, he remained outside in a vehicle with another individual and did not participate in any crimes in Williams' house. Allen contends that Trial Counsel was ineffective in failing to introduce evidence from Manoogian and Yorek, two witnesses who called 911. Both Manoogian and Yorek only saw one person who appeared injured, on Foulk Road, in contrast with Williams who claimed he saw two people fleeing across his front yard, cross Foulk Road and enter a car in a medical office complex. He argues that: (1) Trial Counsel's performance was deficient because it was inexplicable and indefensible for him to have relied exclusively on Clark's testimony alone when the witnesses would have effectively corroborated Allen's account of the events;[13] and (2) Allen has been prejudiced

---

[12] Mot. for Postconviction Relief, at 20, D.I. 87.
[13] *Id.* at 30-31.

because the witnesses' testimony "would have revealed the defense theory as the most plausible account; ***and ultimately as the truthful account***."[14]  As noted, Allen has withdrawn his *Brady* claim.[15]

In its post-hearing letter memorandum responding to Allen's post-hearing memorandum, the State asks the Court to consider all of its prior submissions.[16] Prior to the hearing, and before the Court's April 15, 2024 decision, the State took the position that Allen had failed to demonstrate Trial Counsel was deficient because: (1) "Trial counsel's decision to refrain from introducing the 911 calls and Williams' statement during his August 2015 interview falls within the wide range of professional assistance[;]"[17] and (2) "Trial counsel's decision is entitled to a strong degree of deference and the decision to do so was not unreasonable."[18]  Additionally, the State argued that even if Trial Counsel had presented testimony from the two 911 callers, Allen cannot show that the trial outcome would have been different.[19]

---

[14] *Id.* at 32. (emphasis in original.)
[15] Def.'s Post-Hrg Mem., at 1, D.I. 113.
[16] State's Post-Hrg. Mem., at 1, D.I. 115.
[17] State's Amend. Resp, at 24, D.I. 99.
[18] *Id.*
[19] *Id.* at 26.

In his reply to the State's post-hearing letter memorandum, Allen argues that the evidence against him was not overwhelming.[20] He also takes issue with the State's understanding of prejudice under *Strickland v. Washington*.[21]

## IV.    STANDARD OF REVIEW

To successfully bring an IAC claim, a claimant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficiencies prejudiced the claimant by depriving him or her of a fair trial with reliable results.[22] To prove counsel's deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness.[23] Moreover, a defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.[24] "[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[25] A successful Sixth Amendment claim of IAC requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[26] An inmate must satisfy the proof requirements of both

---

[20] Def.'s Post-Hrg. Reply Mem, at 1-5, D.I. 115.

[21] *Id.* at 5-8.

[22] *Strickland v. Washington,* 466 U.S. at 688 (1984).

[23] *Id.* at 667-68.

[24] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[25] *Strickland*, 446 U.S. at 689.

[26] *Id.* at 694.

prongs to succeed on an IAC claim.  Failure to do so on either prong will doom the claim and the Court need not address the other.[27]

## V.    DISCUSSION

The Court first considers whether Trial Counsel's performance was deficient under *Strickland*.   Neither Trial Counsel's affidavit, nor his hearing testimony support an argument that his performance fell within the "wide range of reasonable professional assistance."  As the Court found in its April 15, 2024 Memorandum Opinion:

> Trial Counsel's affidavit appears to understand Allen's argument to be that "trial counsel should have argued that Allen never entered Williams' house."[28]  But, that is ***not*** Allen's argument.  Allen's argument is "that trial counsel failed to utilize readily available evidence supporting his own theory, that Allen never entered the house *that afternoon* when the alleged crime occurred."[29]  In other words, Allen's claim acknowledges that he entered the house on an earlier visit, but not at a second, later time when the alleged crime occurred.  He contends that the missing testimony of both Manoogian and Baldwin that they only saw one individual fleeing and getting into a car would have corroborated his version and contradicted Williams' testimony.[30]

---

[27] *Strickland,* 466 U.S. at 697; *Ploof v. State,* 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.").
[28] Allen's Reply to State's Am. Resp., at 3, D.I. 100.
[29] *Id.*
[30] *State v. Allen,* 2024 WL 1654514, at *16 (Del. Super. Ct. Apr. 15, 2024).

Trial Counsel's hearing testimony was similarly unhelpful, characterized by a notable lack of recollection, and occasional confusion concerning the identities of key trial participants. Ultimately, the Court was left with this exchange:

> THE COURT: …Do you agree with that, that if –that the testimony of Williams and Manoogian Baldwin and Manoogian that they only saw one person would have contradicted Williams' testimony?
>
> THE WITNESS: Yes.
>
> THE COURT: Why didn't you call either one?
>
> THE WITNESS: I don't recall, Your Honor. I have no recollection.[31]

Absent any explanation from Trial Counsel for his failure to call independent witnesses whom he admitted would contradict Williams' testimony, the Court cannot conclude that he acted within "the wide range of reasonable professional assistance." The Court must conclude that Trial Counsel's performance "fell below an objective standard of reasonableness."

The Court's focus now turns to whether Trial Counsel's deficient performance prejudiced Allen by depriving him of a fair trial with reliable results.[32] In other words, the Court must determine whether Allen has made a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[31] Hrg. Tr. (July 25, 2024) at 57:2–9.
[32] *Strickland v. Washington,* 466 U.S. at 688.

14

proceeding would have been different."[33]  "A reasonable probability means a probability sufficient to undermine confidence in the outcome, a standard lower than more likely than not.  The likelihood of a different result must be substantial not just conceivable."[34]

The potentially exculpatory evidence comes from the statements and testimony of Manoogian and Yorek.  Both were 911-callers who witnessed Clark on Foulk Road on the day of the home invasion.

First, the Court reviews Williams' testimony.  During Clark's trial,[35] Williams testified as to his account of Allen and Clark fleeing his home:

> A. I hear my front door open and I think - - when the front door open [sic] I think that they're about to let the third - - they're yelling for the third guy to come help us because this guy got out of control and he's fighting us, we need more help.
>
> So when I hear my front door open, I immediately turn - - I come up, I turn my - - come around the corner and I'm looking down my stairwell. And when I look down my stairwell, I see somebody pop out of my office and I just left [sic] off, boom, boom, boom. I shoot three times and they run out the door.
>
> I run down the steps behind them and I run out the door behind them. And when I run out the door, they're running across my front lawn which leads to Foulk Road. And they cross Foulk Road. And by this time, there's the

---

[33] *Id.* at 694.
[34] *Swan v. State,* 284 A.3d 839, 859 (Del. 2021) (citing *Green v. State,* 238 A.3d 160, 174 (Del. 2020)) (quoting *Starling v. State,* 130 A.3d 316, 325 (Del. 2015)).
[35] *State v. Jeremy Clark,* 150900095.

same white car that was parked in my driveway when they dropped them off is across the street in a medical complex. He's backing out of the parking spot and he's coming down the hill to Foulk Road.

They run across Foulk Road, they get in that car and they turn and make a left - - well, they make a right on their right and they go down toward Silverside Road.[36]

…

Q. And from the time that you started firing to the time that - - did they - - were they - - did they wait in the house, did they leave immediately, did they leave a little later? Do you know how long it was after you fired that they left the house?

A. Oh, they were running out of the house after I started - - after I was firing.

Q. So the vehicle - - you said that you saw both of them run to a vehicle?

A. Yes.[37]

…

Q. Were you able to tell while you were watching them which - - where the two ended up entering the car? Did you see them actually enter the car?

A. I did but, no, I didn't make note of which one got in which space.

Q. But you saw them both enter?

A. They both got in that car and drove off, yes.

---

[36] Clark's Trial Tr. (Sept. 21, 2016) at 81:18-82:22, D.I. 106.
[36] *Id.* at 94:11-21.

Q. And I know you testified, but where did you see them drive off to?

A. They came - - they came out of the medical center, which is - - which basically is - - it's not directly across the street from my house, but it's - - he's next door to the guy across the street from my house, so it's over this side.

They came down there, down out of the driveway of [sic] there and they made - - which would have been their right to my left - - and they went toward Silverside Road. I didn't see where they went after, I just know they went toward Silverside Road.[38]

During Allen's trial, Williams again testified as to his account of Allen and Clark fleeing his home:

MS. DILIBERTO: … So you went up to the bedroom, you grabbed that gun, it was still there and you said you were standing at the top of your stairwell?

WILLIAMS: I was standing in the doorway of my bedroom, which - - standing in the doorway of my bedroom, it's a wall there but on the other side of that wall is a stairwell that comes down the steps back downstairs. So I'm standing there with the gun holding it, waiting for somebody to come upstairs.

Instead, I hear my front door open and I don't know if they are either leaving, coming, I don't know if they went and got the other guy who brought the phone to the door, his backup to come get me, so I immediately spinned around - - and I'm standing at the top of the steps now. And when I'm standing at the top of the steps, I see the guy with the white Jordans come out of my office and he's standing at the front door. And the guy with the Yankee's

---

[38] *Id.* at 95:15-96:14.

cap is standing outside on the steps saying: Come on. Come on. Come on.

As I come down the steps, I come down the steps and I shoot three times: Boom, boom, boom. I don't know if I hit him at the time or not, but I shot three times going down the steps. They both - - he ran out of the door and both of them ran across my lawn towards the - - it's an office complex, doctors office across the street with a parking lot. And they were running across my yard and then across Foulk Road up the hill to the doctor's office where I assumed there was a car parked.

So now I come down from the steps behind them and come out the front door. And I'm standing on the steps yelling, just yelling obscenities or whatever emotion that I was yelling at the time about them: Come back. Come back. Come back. I got you now. Whatever anger I was yelling when they were running across the street.

And then I see the same white Chevrolet with the New York plates on it, it's pulling out of the doctor's office and then they both jump in that car and they pull off and they go south on Foulk Road.

MS. DILIBERTO: So the car you saw - - after you fired your gun and they ran outside, do you go outside and follow them out to see where they are going?[39]

WILLIAMS: Yeah, I'm out on the step. I don't think I went any further than my step., [sic] my stoop outside of my door, but - -

MS. DILIBERTO: Okay?

WILLIAMS: But I was [sic] definitely ran out after them.

---

[39] Allen's Trial Tr. (Nov. 15, 2018) at 43-44, D.I. 69.

MS. DILIBERTO: Okay. And you said you see them kind of run across Foulk Road?

WILLIAMS: Yeah, I saw them run diagonally across Foulk Road. Directly across me on Foulk Road is another house, but to the left of that house is a - - you go up a hill, it's on a raised hill and it's a little office complex right there.

MS. DILIBERTO: Did it appear to you that someone else was driving - -

WILLIAMS: Oh somebody was definitely driving. The car was moving.

MS. DILIBERTO: So this car you saw, was this, did this appear to be the same car you saw initially in your driveway?

WILLIAMS: I believe that it was the same car that I saw initially in my driveway.

MS. DILIBERTO: Okay. Was the car moving?

WILLIAMS: The car was moving.[40]

MS. DILIBERTO: Okay. And where was it moving toward?

WILLIAMS: It pulled out of that doctors office and it made - - that would have been making a right on Foulk Road and it went south on Foulk Road.[41]

At the evidentiary hearing, Williams testified on cross-examination by the State:

---

[40] *Id.* at 45.
[41] *Id.* at 46.

Q. Okay. So when you shot the three shots, is it fair to say one of the suspects was still inside your residence?

A. One was still in my front yard looking into my front door.

Q. Okay. And is it fair to say that the suspects did not exit your residence at the same time?

A. Technically, no. One was outside already and one was still in the house looking for something in the office.[42]

On recross-examination, Williams testified:

Q. Once you got down your steps –

A. What do I see? I see the same white Chevrolet with I see them getting in that Chevrolet, which whether I actually physically saw the second guy get in the Chevrolet is irrelevant because they were both in my house and hey both left in that Chevrolet.

They came in that Chevrolet and they left in that Chevrolet, so why wouldn't I think that they ran across the street and got in the Chevrolet? He didn't teleport there. He had to run across the street and get in that Chevrolet with them and then those three guys left in that Chevrolet.

Q. Can you recall whether you saw them get in the Chevrolet at the exact same time?

A. No.[43]

In response to the Court's questions, Williams testified:

THE COURT: You testified at trial that after the second person left your house, the one you shot at –

---

[42] Hrg. Tr. (July 25, 2024) at 103:9-19.
[43] *Id.* at 111:1-16.

THE WITNESS: Right.

THE COURT: -- you went down and I guess right outside your front door you saw them running across your yard, across Foulk Road and getting into a car.

THE WITNESS: Yes.

THE COURT: How close together were they?

THE WITNESS: I can't remember. Nine years ago. I can't remember.[44]

Manoogian was one of the two witnesses who called 911. In his call, Manoogian stated that he saw a man who "had blood all over his white T-shirt and what looked like a hole in his back."[45] Manoogian added that the man ran across Foulk Road.[46] In a later interview, Manoogian indicated that he was driving north on Foulk Road and that the man was jogging south on the sidewalk to his left.[47] Manoogian emphasized that the man was alone.[48]

Manoogian testified at the hearing, but not at either Clark's trial or Allen's trial. At the hearing, Manoogian testified in response questioning by counsel for Allen that he was driving north on Foulk Road when he saw someone on the

---

[44] *Id.* at 111:21-112:9.

[45] Mot. for Postconviction Relief Appendix at A46, D.I. 88.

[46] *See id.*

[47] *Id.* at A48. Manoogian also stated that he appeared at Court and was excused upon his request. Manoogian was not sure which defendant was on trial during his appearance.

[48] *Id.*

21

southbound sidewalk "kind of jogging that had I believe a white shirt with a lot of blood on it at the time" who appeared to be by himself.[49]  He saw him jogging for about three or four seconds, but did not see where he went.[50]  On cross-examination by the State, Manoogian acknowledged that it was possible that there were other pedestrians he did not see, and that he did not see the person get into a vehicle.[51]  Under questioning by the Court Manoogian said that what drew his attention from the road and oncoming traffic was the person jogging on the opposite side of Foulk Road, but did not remember if he saw anyone as close as 10 or 20 feet in front of that person.[52]

Yorek was the other witness who called 911.  Yorek told the 911 operator that while she was driving on Foulk Road she saw a man enter the backseat of a vehicle.[53]  She also said that the man entered the vehicle in the middle of the road and that he had blood on his shirt.[54]  At Clark's trial, Yorek testified as a witness for the State.[55]  She testified that she viewed the man as she drove down a "little hill" on Foulk Road next to an office complex.[56]  She stated that there were two other men in the vehicle;

---

[49] Hrg. Tr. (July 25, 2024), at 63:8-20.
[50] *Id.* at 63:21-64:2.
[51] *Id.* at 65:14-20.
[52] *Id.* at 68:10-69:16.
[53] *Id.* at A45.
[54] *Id.*
[55] Clark's Trial Tr. (Sept. 21, 2016) at 3, D.I. 106.
[56] *See id.* at 4-5, 8-9.

one man was in the driver's seat and one man was in the passenger seat.[57]  Yorek described the passenger seat as "leaned all the way back."[58]  In a later interview with Allen's private investigator, she specified that the man with the bloody T-shirt entered the backseat of the vehicle on the driver's side.[59]

At the hearing, on direct-examination by Allen's counsel, Yorek testified that she was driving southbound on Foulk Road coming to a stop at the intersection with Silverside Road when she observed a person coming from her right with a bloody shirt cross in front of her and get into the rear driver's side seat of a vehicle in the turn lane to turn left onto Silverside Road.[60]  Two other people were already in the vehicle – the driver and a person in the front passenger seat.[61]  When she first saw the person who got in the rear seat, he was alone.[62]  On cross-examination, Yorek recalled that the person initially "was going to get behind the passenger, but the passenger seat was leaned so far back that I don't know if he can fit", but was not entirely sure of that recollection.[63]  On redirect-examination she felt that "maybe he did go to that side of the door first and it might have been locked or something took place because the person in the passenger seat was leaned back, so he was leaning

---

[57] *Id*. at 9.
[58] *Id*. at 20-21
[59] Mot. for Postconviction Relief Appendix at A47, D.I. 88.
[60] Hrg. Tr. (July 25, 2024), at 72:10-73:8.
[61] *Id.*
[62] *Id.* at 74:11-13.
[63] *Id.* at 77:13-19.

and then he went like that and then I think walked around and then sat behind the driver."[64]

Obviously, the Court's task in determining whether Allen received a fair trial with reliable results and whether, but for Trial Counsel's errors, there is a reasonable probability that the outcome of his trial would have been different goes beyond simply comparing the witnesses in Clark's trial and in Allen's trial and attributing the difference outcomes to the difference in witnesses. The defense attorneys were different, the lead prosecutors were different, and most importantly, the juries were different. Instead, the Court does three things. First, to the extent it is able, it assesses the degree to which Yorek's testimony contributed to the outcome in Clark's trial. Next, it looks at the probative value of the proposed testimony of Manoogian and Yorek. Finally, it balances the weight of their testimony against the strength of the State's case.

Allen's counsel has provided the Court with transcriptions of most, but not all, of Clark's trial proceedings.[65] The Court has before it four days of witness testimony, September 20 through September 23, 2016, but it does not have transcripts of jury selection, opening statements, closing arguments, or jury instructions.[66] The Court assumes those latter proceedings were not transcribed

---

[64] *Id.* at 81:3-8.
[65] *See,* D.I. 106.
[66] *Id.*

because Clark was acquitted and only transcripts of witness testimony would be of any value for Allen's trial.[67]  Therefore, the Court looks to Yorek's cross-examination by Clark's counsel to divine what significance he attributed to her testimony.

On direct examination, Yorek's testimony was substantively the same as her 911 call and her testimony at the evidentiary hearing.[68]  Cross-examination was unremarkable, comprising slightly more than 11 pages of transcript.[69]  What is noteworthy for purposes of this Motion, however, is that in his questioning, Clark's attorney placed absolutely no emphasis on the fact that Yorek testified that there were already two people in the vehicle when she saw the injured person enter it as it prepared to turn left onto silverside Road.  In other words, he made to attempt to contradict Williams' testimony with Yorek's testimony.  The Court cannot afford her testimony the significance Allen ascribes to it.  There simply is no support in the Clark trial record that Yorek's testimony played any role in Clark's acquittal.[70]

Next, the Court assesses the probative value of the testimony of Manoogian and Yorek.  Manoogian and the injured person he saw jogging were travelling in

---

[67] The transcripts of Clark's trial were not filed until November 19, 2018, well after his trial in 2016, but during Allen's trial. *State v. Clark,* I.D. No. 150900095, D.I. 47.

[68] Clark Tr. (Sept. 21, 2016), at 3:17-15:15, D.I. 106.

[69] *Id.* at 16:3-27:15.

[70] For purposes of this Motion, the Court need not attempt to explain the basis for Clark's acquittal.  But a fair reading of his trial transcript appears to show that his attorney aggressively cross-examined Williams on his version of events.

opposite directions on Foulk Road on opposite sides of the street. He did not see whether there was anyone else jogging 10 to 20 feet ahead of that person, nor did he see any vehicle that the injured person entered. Clearly, his testimony leaves open the possibility that another person outside of his limited range of vision was ahead of the injured person. Manoogian only saw a relatively small snippet of a larger incident. The impeachment value of his testimony is affected by his limited perspective. The Court finds the probative value of Manoogian's testimony only marginally impeaches Williams' testimony, and assigns it little probative value.

The Court views Yorek's testimony at the evidentiary hearing as what Allen contends Trial Counsel should have presented at his trial rather that her relatively innocuous testimony at Clark's trial. While it more directly contradicts Williams' testimony it is not without its potential downside for Allen. Yorek testified that the person who was in the front passenger seat, presumably Allen, had "his seat [was] leaned extremely far back, so – I mean, you could just see, like his head and shoulder so he was just, you know, hunkered down like this and I thought, you know, this just doesn't look right…"[71] The obvious inference to be drawn is that Allen was trying to conceal himself from view due to a consciousness of guilt. For that reason, the Court assigns Yorek's testimony some, but limited probative value.

---

[71] Clark Tr. (Sept. 21, 2016), at 11:20-12:3 D.I. 106.

26

In weighing the State's trial evidence against the proffered testimony of Manoogian and Yorek, the Court finds that Trial Counsel's deficient performance did not deprive Allen of a fair trial with reliable results. The Court determines that there is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In reaching this conclusion, the Court relies not only on Williams trial testimony, but also on other evidence corroborating that testimony. That other evidence includes: (1) duct tape found on Williams' wrist and leg, and in his office and upstairs bedroom; (2) slices of pizza and a torn pizza box found in the downstairs hallway; (3) a roll of duct tape and two firearm magazines found in Williams' office; (4) Clark's fingerprint on a piece of duct tape and Allen's fingerprint on the pizza box; (5) Allen's cell phone repeatedly pinging off a cell phone tower near Williams' residence between 10:46 a.m. and 2:49 p.m.; and (6) messages on Clark's cell phone, including one sent to Gees 2, "Tape and rope."

Additionally, Allen's statement to police is inconsistent in several important respects with his defense at trial presented through Clark. In that regard, attacking Williams' credibility through the testimony of Manoogian and Yorek is akin to judging the mote in Williams' eye while ignoring the beam in his own. Specifically, Allen said he stopped for pizza and cheesesteaks before going to Williams' house, but Clark denied ever doing so. Allen denied ever entering Williams house at all,

27

while Clark testified Allen went in the house the first time they were there. Importantly, this denial leaves Allen's fingerprint on the pizza box unexplained by him. Allen told police that only he and Clark went to Williams home. Clark testified that Gees was with them too. Contradicting Allen, Yorek testified that there were three people in the car she saw, further weakening the beneficial impact of her proposed testimony. Allen told the police that he and Clark only went to Williams' house once that day, while Clark testified they went twice. Allen's cell phone pinging off a cell tower near Williams' house for four hours undermines Allen's version. In sum, the Court finds there are major inconsistencies and discrepancies between Allen's statement to the police and his own theory of defense. Those inconsistencies and discrepancies significantly outweigh any flaws in Williams' description of his assailants' flight.

Finally, although neither party argued the issue, either on postconviction relief or at trial, the jury was instructed on accomplice liability.[72] In her Opinion on Allen's Motion for Judgement of Acquittal, the Trial Judge noted that during trial, she denied Allen's earlier Motion for Judgment of Acquittal at the close of the State' case, finding, "the State presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Allen committed the charged crimes ether as a

---

[72] D.I. 60.

28

principal or as an accomplice."[73]  The Court finds that even if the jury disregarded Williams' testimony about how many people entered his house, there was sufficient evidence for the jury to find him guilty as an accomplice and for that result to be reliable.  Accordingly the Motion is **DENIED.**

## VI. CONCLUSION

For the foregoing reasons, Allen's Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.

---

[73] *State v. Allen,* 2019 WL 4740842, at *4 (Del. Super. Ct. Sept 24, 2019).